10 A.3d 184

**Ashanti COST**

v.

**STATE of Maryland.**

**No. 116, Sept. Term, 2009.**

Court of Appeals of Maryland.

Dec. 17, 2010.

Marc A. DeSimone, Jr., Asst. Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for petitioner.

Robert Taylor, Jr., Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Russell P. Butler, Matthew S. Ornstein, Upper Marlboro, brief of Amicus Curiae Maryland Crime Victims' Resource Center, Inc.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

ADKINS, J.

Petitioner Ashanti Cost was convicted of reckless endangerment for an alleged stabbing attack on Michael Brown, a fellow inmate at the Maryland Correctional Adjustment Center ("MCAC"). During the course of investigating the incident, the State sealed Brown's cell and took several items of physical evidence into custody. Apparently, these items were

later disposed of by the State, rather than being preserved as evidence for use in Cost's trial. At trial, Cost sought a jury instruction regarding the destruction of this evidence, but his request was denied. Additionally, after his conviction, Cost received records indicating that Brown had a history of inflicting stab wounds upon himself. Cost unsuccessfully argued that this information should have been disclosed as material under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We granted certiorari to consider the following two questions:

1. Did the lower court err in holding that the trial court did not err in failing to instruct the jury on spoliation because such an instruction is never required in criminal cases?

2. Did the State violate its obligation under [*Brady* ], when it failed to disclose that the victim had a history of self-inflicted superficial stab wounds while in State custody?

We shall hold that the trial court erred by refusing Cost's proposed instruction, vacate Cost's conviction, and remand for a new trial. Because we so hold, we need not reach the second question presented.

## FACTS AND LEGAL PROCEEDINGS

Petitioner Ashanti Cost is an inmate at the Maryland Correctional Adjustment Center, a so-called "Supermax" prison, located in Baltimore City. At the time of the events giving rise to this appeal, Cost had recently been transferred to MCAC from another facility in Hagerstown. Cost alleges that this transfer to the more restrictive facility was retaliation for Cost's testimony before a Senate committee investigating the death of a Hagerstown facility inmate at the hands of prison guards.

According to the State, Cost attacked another MCAC inmate, Michael Brown, on September 28, 2005. Brown was detained at MCAC as a material witness for the federal government in a separate case. Cost was charged with assault in the first degree, assault in the second degree, openly

wearing and carrying a deadly weapon with intent to injure, and reckless endangerment. At the time of the alleged attack, both Cost and Brown were "locked down" in their cells for twenty-three hours per day, except for medical escorts and one hour of "outside activity." This is standard practice in many "Supermax" prisons such as MCAC.

At Cost's trial in the Circuit Court for Baltimore City, Brown testified that he had been a federal informant for approximately six years, and that Cost had previously threatened to kill Brown because he was an informant. According to Brown, Cost threw feces into Brown's cell through cracks in the cell door, and issued a vulgar threat against Brown. Brown further testified that Cost grabbed Brown's clothing through a food slot in the cell door, pulled him close to the door, and stabbed him in the abdomen with an approximately six-inch long metal weapon "like an ice pick." Brown claimed that the wound "was bleeding a lot ... running like water." Brown testified that he was admitted to Johns Hopkins Hospital and treated for "internal bleeding, dizziness, a lot of things like that."

At trial, Cost pointed to a number of facts that he alleged cast doubt on Brown's version of events. To begin with, Cost had been searched before being allowed to leave his cell, and no weapons or other contraband were found on his person. After the attack, the entire unit area was searched for weapons, and none were recovered. Cost also challenged the alleged severity of Brown's injury, drawing support from Brown's hospital discharge forms. In particular, Cost relied on medical records stating that Brown's alleged ice pick wound was "approximately 1 inch long [and] only penetrated the skin" and was "approximately 3 millimeters in length...." Brown's recommended course of treatment was "over-the-counter pain relief such as Tylenol or ibuprofen[,]" which Cost argued cast doubt on the severity of the injury.

More significantly, Cost focused on a series of unusual evidence and chain of custody issues that arose relating to the condition of Brown's cell. At trial, the State introduced as

evidence photographs of Brown's cell taken the evening following the alleged attack. The photographs show significant red staining on the floor of the cell, which Brown identified as his blood.[1] Brown also testified that the photographs showed a towel which he had used to try to stop his abdominal bleeding. Major Donna Hansen, who was MCAC's investigative officer at the time of the attack and who took the photographs, testified that when she entered Brown's cell she observed "a large amount of what appeared to be blood and smelled like blood on the floor and on the mattress[,]" as well what she believed to be several towels lying on the floor. She further testified that she did not collect any towels or bedding as evidence, as that would be the responsibility of the Department of Public Safety and Correctional Services's Internal Investigative Unit ("IIU"). Hansen testified that on the night of the attack, she placed a call to Detective Bob Fagen, the IIU duty officer on the day in question.

There is some uncertainty as to precisely what events followed Hansen's alleged call to Detective Fagen. According to Detective Karen Griffiths, a detective with the IIU at the time of these events, she received a call from Hansen on October 3, 2005, five days after the attack. Griffiths testified that Hansen said "that she had a cell sealed and wanted to know if [IIU] would release that cell. . . ." According to Griffiths, this was the first time she became aware of the attack. Griffiths further testified that when she queried her supervisor about the case, it was assigned to her.

After the assignment, Griffiths went to MCAC to pursue her investigation. She did not, however, examine Brown's cell, because it had been cleaned. In addition, no physical evidence had been preserved from the cell—neither towels nor bedding had been stored for Griffiths's review. Griffiths testified that she did not tell Hansen to unseal the cell; those instructions apparently issued from Griffiths's supervisor. According to Griffiths, the case had actually initially been "re-

---

**1.** At trial, Cost endeavored to explain the staining in the cell by suggesting that it was caused by melted red Jell-O.

ferred back to Major Hansen, who is a trained investigator, and [IIU was] not going to handle that crime scene." Brown's clothing from the night of the alleged attack, which Hansen had collected, was not accepted by IIU's crime lab "because of the age and the lack of chain of custody."

The absence of the physical evidence from Brown's cell, the contents of which had apparently been disposed of by MCAC staff, led Cost to request a jury instruction regarding the destruction of evidence by the State. Specifically, Cost requested the following instruction:

You have heard the testimony that the Division of Correction, a State agency, has destroyed evidence in this case by failing to preserve a crime scene and failing to retain the bed linens that were seized at the scene.

If this evidence was peculiarly within the power of the State, but was not produced and the absence was not sufficiently accounted for or explained, then you may decide that the evidence would have been formable [sic][2] to the defense.

This proposed instruction appears to be adapted from the Maryland Criminal Pattern Jury Instruction ("MPJI–CR") on missing witnesses. *See* MPJI–CR 3:29.[3] The State objected to Cost's proposed instruction on the grounds that there had been no direct testimony that the physical evidence from Brown's cell had been destroyed.[4] Cost responded that the

---

**2.** The use of the word "formable" appears to be a typographic error. We presume, as did the Court of Special Appeals, that the word was actually "favorable."

**3.** The MPJI–CR instruction for "missing witnesses" reads as follows:

You have heard testimony about _____, who was not called as a witness in this case. If a witness could have given important testimony on an issue in this case and if the witness was peculiarly within the power of the [State] [defendant] to produce, but was not called as a witness by the [State] [defendant] and the absence of that witness was not sufficiently accounted for or explained, then you may decide that the testimony of that witness would have been unfavorable to the [State] [defendant].

**4.** The State does not rely on the testimony issue in this appeal, focusing instead on the fact that the destruction of evidence was "not undertaken

State "had the duty to preserve that crime scene for [Griffiths] to get there to investigate it[,]" and that the cell "was certainly in control of the State and nobody else" when Griffiths's supervisor told Hansen that the cell could be unsealed. The trial court ultimately refused to give the requested instruction, "in the absence of any testimony to support that the State deliberately destroyed the evidence. . . ."

The jury ultimately acquitted Cost of assault in the first degree, assault in the second degree, and openly wearing and carrying a deadly weapon with intent to injure, but convicted him on the charge of reckless endangerment. Cost was sentenced to five years incarceration, to be served consecutive to his existing prison term.[5] On appeal, the Court of Special Appeals affirmed the judgment of the trial court with respect to refusing to instruct the jury on the missing evidence. In an unreported opinion, the intermediate appellate court held that "the State's failure to preserve evidence, or the actual destruction of evidence, may . . . . give rise to inferences against the State. . . ." It further held, however, that a defendant is not entitled "to an instruction where that instruction relates to *permissible inferences of fact* [,]" as opposed to an instruction on governing law, and affirmed Cost's conviction. We granted Cost's Petition for a Writ of Certiorari. *Cost v. State*, 411 Md. 355, 983 A.2d 431 (2009).

## STANDARD OF REVIEW

We review whether a trial court abused its discretion in refusing to offer a jury instruction under well-defined standards. A trial court must give a requested jury instruction where "(1) the instruction is a correct statement of law; (2) the instruction is applicable to the facts of the case; and (3) the content of the instruction was not fairly covered elsewhere

---

in bad faith and consequently did not amount to a due process violation."

**5.** Cost's prior sentence has now lapsed, and he is currently incarcerated on the basis of only the reckless endangerment conviction.

in instructions actually given." *Dickey v. State*, 404 Md. 187, 197–98, 946 A.2d 444, 450 (2008); *see also* Md. Rule 4–325(c). We review a trial court's decision whether to grant a jury instruction under an abuse of discretion standard. *See, e.g., Thompson v. State*, 393 Md. 291, 311, 901 A.2d 208, 220 (2006). On review, jury instructions

> [M]ust be read together, and if, taken as a whole, they correctly state the law, are not misleading, and cover adequately the issues raised by the evidence, the defendant has not been prejudiced and reversal is inappropriate. Reversal is not required where the jury instructions, taken as a whole, sufficiently protect[ed] the defendant's rights and adequately covered the theory of the defense.

*Fleming v. State*, 373 Md. 426, 433, 818 A.2d 1117, 1121 (2003). Thus, while the trial court has discretion, we will reverse the decision if we find that the defendant's rights were not adequately protected. *See, e.g., General v. State*, 367 Md. 475, 789 A.2d 102 (2002) (trial court abused its discretion in refusing to give a "mistake of fact" instruction); *Smith v. State*, 302 Md. 175, 486 A.2d 196 (1985) (trial court abused discretion in refusing to give an instruction on alibi).

## ANALYSIS

### 1. Missing Evidence Instructions, Generally

As a preliminary matter, we find that Cost's proposed instruction is most accurately labeled as a "missing evidence" instruction. While the Court of Special Appeals, as well as Cost, characterized Cost's claim as "spoliation," we consider this moniker misleading. As we describe below, "spoliation" is often used in civil cases, where parties withhold or destroy evidence strategically. The term "spoliation," moreover, is often associated with egregious or bad faith actions, and not for cases involving negligent destruction or loss. Yet here, in the criminal context, "spoliation" is an imprecise term. Instead, Cost's claim is more accurately

titled as "missing evidence," [6] which can include situations where the State intentionally or negligently destroyed—or merely failed to produce—relevant evidence.

Maryland recognizes some form of jury instructions regarding missing or destroyed evidence in both civil and the criminal contexts. In the civil context, we give a jury instruction for the "spoliation of evidence" where a party has destroyed or failed to produce evidence. The pattern jury instruction reads as follows:

> The destruction of or the failure to preserve evidence by a party may give rise to an inference unfavorable to that party. If you find that the intent was to conceal the evidence, the destruction or failure to preserve must be inferred to indicate that the party believes that his or her case is weak and that he or she would not prevail if the evidence was preserved. If you find that the destruction or failure to preserve the evidence was negligent, you may, but are not required to, infer that the evidence, if preserved, would have been unfavorable to that party.

MPJI–CV 1:10. Such an instruction is designed to draw a jury's attention to a simple, straightforward premise: that "one does not ordinarily withhold evidence that is beneficial to one's case." *Anderson v. Litzenberg*, 115 Md.App. 549, 562, 694 A.2d 150, 156 (1997). The instruction does not require that a jury make an adverse inference in situations involving the spoliation of evidence; rather, it merely permits such an inference.[7] *See* Joseph F. Murphy, Jr., *Maryland Evidence*

---

**6.** As we stated above, Cost's proposed instruction is modeled off the "missing witness" instruction of the criminal Maryland Pattern Jury Instructions.

**7.** The Court of Special Appeals has elaborated on the function and purpose of the instruction:

> The destruction or alteration of evidence by a party gives rise to inferences or presumptions unfavorable to the spoliator, the nature of the inference being dependent upon the intent or motivation of the party. Unexplained and intentional destruction of evidence by a litigant gives rise to an inference that the evidence would have been unfavorable to his cause, but would not in itself amount to substan-

*Handbook* § 409 (4th ed.2010) ("Destruction of evidence permits, but does not require, an inference that the evidence would have been unfavorable to the position of the party who destroyed the evidence.").

We have also recognized a "missing evidence" instruction in a criminal proceeding, though only against the defendant. The Maryland Criminal Pattern Jury Instructions ("MPJI–CR") include an instruction on "Concealment or Destruction of Evidence as Consciousness of Guilt[,]" which reads in part as follows:

> Concealment or destruction of evidence is not enough by itself to establish guilt, but may be considered as evidence of guilt. Concealment or destruction of evidence may be motivated by a variety of factors, some of which are fully consistent with innocence.
>
> You must first decide whether the defendant [concealed, destroyed, or attempted to conceal or destroy] evidence in this case. If you find that the defendant [did so] ... then you must decide whether that conduct shows a consciousness of guilt.

MPJI–CR 3:26. We have held that "[c]onsciousness of guilt evidence ..., including ... destruction or concealment of evidence[,]" is significant because "the particular behavior provides clues to the [actor's] state of mind[.]" *Decker v. State,* 408 Md. 631, 640, 641, 971 A.2d 268, 274 (2009). This is hardly a novel concept; numerous commentators have expressed similar sentiments. Wigmore, for example, has explained the significance of the destruction of evidence as follows:

> It has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's

---

tive proof of a fact essential to his opponent's cause. The maxim, *Omnia praesumuntur contra spoliatem,* "all things presumed against the spoliator," rests upon the logical proposition that one would ordinarily not destroy evidence favorable to himself.

*Miller v. Montgomery County,* 64 Md.App. 202, 214, 494 A.2d 761, 768 (1985) (citation omitted).

falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause.

2 John Henry Wigmore, *Evidence in Trials at Common Law* § 278 (Chadbourn rev.1979) (emphasis deleted and footnote omitted).

Here we consider the distinct, though related, question of when a "missing evidence" instruction is required against the State in a criminal proceeding.

### 2. *Patterson* and Missing Evidence Instructions for a Criminal Defendant

In a previous case, we have considered whether a defendant in a criminal case was entitled to a jury instruction regarding evidence that the State had failed to produce. *See Patterson v. State*, 356 Md. 677, 682, 741 A.2d 1119, 1121 (1999). In *Patterson*, the defendant was convicted of drug possession after police discovered a jacket in the trunk of his car with crack cocaine in its pockets. *See id.* at 680–81, 741 A.2d at 1121. The jacket was not itself introduced into evidence; instead, prosecutors offered into evidence a photograph of the jacket in the trunk of the defendant's car. *See id.* The defendant unsuccessfully requested a "missing evidence" jury instruction stating that if the jacket "was peculiarly within the power of the State to produce, but was not produced by the State and the absence of that evidence was not sufficiently accounted for or explained, then [the jury] may decide that the evidence would have been unfavorable to the State." *Id.* at 682, 741 A.2d at 1121.

We analyzed the trial court's refusal to instruct the jury under substantive Maryland evidence law and on due process

grounds. First, we held as a matter of Maryland law that the trial court did not err in rejecting the missing evidence instruction, as trial courts "[g]enerally ... need not instruct ... on the presence or absence of most evidentiary inferences, including 'missing evidence' inferences." *Patterson*, 356 Md. at 694, 741 A.2d at 1127. We then considered the defendant's claim that the defendant's due process rights were violated by the state's failure to produce the jacket. While noting that other states had found additional protections for defendants in their state constitutions, we found that Maryland's Constitution guaranteed no additional protections:

The United States Supreme Court's interpretation of the Due Process Clause of the Fourteenth Amendment generally may be applicable in interpreting Article 24 of the Maryland Declaration of Rights. We have considered guarantees in the Declaration of Rights to be in *pari materia* with similar provisions of the federal constitution. Thus, we apply the same standards whether the claim alleges violation of a state or federal constitutional right.

Petitioner contends that the trial court's refusal to give the missing evidence instruction denied him due process of law. The Supreme Court made clear in *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), that when a defendant alleges a denial of due process he or she must prove that the government acted in bad faith[.]

* * *

The *Youngblood* standard logically must extend to the refusal to instruct on the government's failure to preserve evidence.

*Patterson*, 356 Md. at 694–96, 741 A.2d at 1128 (some citations omitted). We thus held in *Patterson* that neither Maryland law nor due process required a jury instruction for the State's failure to produce evidence.

As we recognized in *Patterson*, the requirement that a defendant in a criminal proceeding show "bad faith" has its origin in *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). In *Youngblood*, a man was convicted

for the rape of a young boy despite inconclusive scientific evidence. *See Youngblood*, 488 U.S. at 52–54, 109 S.Ct. at 333–35. One sample of the assailant's semen had not been refrigerated by the State, and expert testimony given at trial demonstrated that the defendant could have been exonerated if the evidence had been preserved. *See id.* at 54, 109 S.Ct. at 335. After conviction, the Arizona Court of Appeals reversed, holding that the State had denied the defendant due process by failing to preserve the evidence. *See id.* The Supreme Court disagreed, holding that the Due Process clause was not violated when "there was no suggestion of bad faith on the part of the police." *Id.* at 58, 109 S.Ct. at 338. The specific holding of *Youngblood* is that the Due Process clause is not violated, and thus the charges *should not be dismissed*, where the defendant has failed to show bad faith by the State in failing to preserve evidence that could be subject to further tests.

Since *Youngblood*, states have struggled to determine the scope of the "bad faith" requirement. Specifically, states have been faced with a problem of whether a defendant in a criminal case could ever be entitled to a remedy, perhaps a lesser one than dismissal, when the State has destroyed or failed to preserve evidence. Courts have had to balance the holding in *Youngblood* with the practical reality that the defendant will rarely, if ever, be able to show "bad faith" by the State. In so doing, different approaches have emerged.

A few states have adopted the *Youngblood* standard and refused to provide extra protections for a defendant in a criminal case. These states include Georgia, Ohio, North Carolina, and Washington. *See Walker v. State*, 264 Ga. 676, 449 S.E.2d 845 (1994) (no due process violation where officer mistakenly destroyed evidence, believing it to be trash); *State v. Lewis*, 70 Ohio App.3d 624, 591 N.E.2d 854 (1990) (conviction upheld where rape test kit was lost by state); *State v. Drdak*, 330 N.C. 587, 411 S.E.2d 604 (1992) (destruction of defendant's blood sample did not preclude admission of defendant's medical records detailing blood alcohol concentration); *State v. Ortiz*, 119 Wash.2d 294, 831 P.2d 1060 (1992) (state

constitution did not afford broader rights for preservation of evidence than the federal Constitution).

Other states have maintained a focus on due process, but sidestepped *Youngblood* by finding additional protections for criminal defendants in *their state constitutions*. *See Thorne v. Dep't. of Pub. Safety*, 774 P.2d 1326, 1330 (Alas.1989) (construing "Alaska Constitution's Due Process Clause to not require a showing of bad faith"); *State v. Morales*, 232 Conn. 707, 657 A.2d 585, 591–592 (1995) (although "due process under the federal constitution does not require a trial court to apply such a balancing test, we are persuaded that due process under [the Connecticut] constitution does."); *State v. Matafeo*, 71 Haw. 183, 787 P.2d 671, 673 (1990) (recognizing that Hawaii due process inquiry must go beyond *Youngblood* ); *Commonwealth v. Henderson*, 411 Mass. 309, 582 N.E.2d 496, 497 (1991) ("The rule under the due process provisions of the Massachusetts Constitution is stricter than that stated in the *Youngblood* opinion."); *State v. Ferguson*, 2 S.W.3d 912, 914 (Tenn.1999) ("[T]he due process principles of the Tennessee Constitution are broader than those enunciated in the United States Constitution [in *Youngblood.*]"); *State v. Tiedemann*, 162 P.3d 1106, 1117 (Utah 2007) (*Youngblood* standard does not "serve as an adequate safeguard of the fundamental fairness required by article I, section 7 of the Utah Constitution."); *State v. Delisle*, 162 Vt. 293, 648 A.2d 632 (1994) (finding additional constitutional protections in Vermont Constitution).

The state due process protections for destroyed evidence are often applied in the form of a balancing test to determine whether some remedy—be it dismissal or a "missing evidence" instruction—is warranted. Delaware, for example, has adopted a balancing test in lieu of any broad application of a "bad faith" requirement. *See Deberry v. State*, 457 A.2d 744 (Del.1983); *see also Hammond v. State*, 569 A.2d 81 (Del.1989) (affirming the *Deberry* approach after *Youngblood* ). Delaware applies three factors in determining whether a defendant is entitled to a remedy: "(1) the degree of negligence or bad faith involved, (2) the importance of the lost evidence, and (3)

the sufficiency of the other evidence adduced at the trial to sustain the conviction." *Deberry,* 457 A.2d at 752. Other states that use a balancing test to answer this question include New Mexico, Tennessee and Vermont. *See State v. Chouinard,* 96 N.M. 658, 634 P.2d 680, 683 (1981); *Ferguson,* 2 S.W.3d at 917; *Delisle,* 648 A.2d at 643.

A few states have avoided *Youngblood's* harsh result by providing a remedy for destroyed evidence as a matter of *state evidence law.* Iowa, while originally limiting the application of the missing evidence inference to those instances in which a defendant's constitutional rights have been violated, has recently modified its approach so as to protect the defendant even in the absence of a due process violation. *Compare State v. Atley,* 564 N.W.2d 817, 822 (Iowa 1997) (holding that an instruction on the missing evidence inference "is only appropriate when such destruction is a violation of a defendant's due process rights"), *with State v. Hartsfield,* 681 N.W.2d 626, 629 (Iowa 2004) (holding, without addressing bad faith, that "a defendant can be entitled to a spoliation instruction without showing that a refusal to give the instruction would be an infringement of his right to due process"). *See also State v. Reffitt,* 145 Ariz. 452, 702 P.2d 681, 690 (1985) *(citing State v. Willits,* 96 Ariz. 184, 393 P.2d 274, 276 (1964) (under Arizona state evidence law, a defendant is entitled to a missing evidence instruction when (1) "the state failed to preserve material and reasonably accessible evidence having a tendency to exonerate him," and (2) "this failure resulted in prejudice.")).

In adopting different approaches than *Youngblood,* courts and commentators have noted the problems with a universal "bad faith" requirement. Vermont, in adopting a balancing test, noted that the "bad faith" standard is both too broad and too narrow:

It is too broad because it would require the imposition of sanctions even though a defendant has demonstrated no prejudice from the lost evidence. It is too narrow because it limits due process violations to only those cases in which a defendant can demonstrate bad faith, even though the negligent loss of evidence may critically prejudice a defendant.

*Delisle,* 648 A.2d at 643. Alaska, in allowing its courts to find a violation in the absence of bad faith, stated:

> The *Youngblood* decision could have the unfortunate effect of encouraging the destruction of evidence to the extent that evidence destroyed becomes merely "potentially useful" since its contents would be unprovable. [We agree] with Justice Stevens' belief that there may be cases "in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair." *Youngblood* [488 U.S. at 61, 109 S.Ct. at 339], 102 L.Ed.2d at 291 (Stevens, J., concurring).

*Thorne,* 774 P.2d at 1331 n. 9. *See also, e.g.,* Norman C. Bay, *Old Blood, Bad Blood, and Young Blood: Due Process, Lost Evidence, and the Limits of Bad Faith,* 86 Wash. U.L.Rev. 241 (2008) (reviewing the near-consensus rejection of *Youngblood* ); Matthew H. Lembke, *Note, The Role of Police Culpability in Leon and Youngblood,* 76 Va. L.Rev. 1213, 1215 (1990) (criticizing the bad faith requirement as "inherently flawed").

Courts have been even more willing to depart from the bad faith requirement when the eventual remedy is a missing evidence instruction, not the dismissal of charges at issue in *Youngblood. See, e.g., Hammond,* 569 A.2d 81, 90 (requiring a missing evidence jury instruction without a showing of bad faith); *Fletcher v. Anchorage,* 650 P.2d 417, 418 (Alaska Ct.App.1982) (when evidence is "lost or destroyed in good faith," a court may decide to "instruct the jury to assume that the [missing] evidence would be favorable to the defendant.") Even some states that adhere to *Youngblood's* bad faith requirement allow or encourage missing evidence instructions. *See State v. Youngblood,* 173 Ariz. 502, 844 P.2d 1152, 1157 (1993) (on remand from Supreme Court, reaffirming "bad faith" standard but noting that "an instruction is adequate where the state destroys, loses or fails to preserve evidence[.]"); *Collins v. Commonwealth,* 951 S.W.2d 569 (Ky. 1997) (following *Youngblood* but stating that a "factor of

critical importance to this case is the missing evidence instruction that was provided [through which] any uncertainty as to what the [missing evidence] might have proved was turned to [defendant's] advantage.")

In these cases, we see an emerging consensus that a universal bad faith standard does not go far enough to adequately protect the rights of a person charged with a crime. The courts have seen the bad faith requirement as a potentially bottomless pit for a defendant's interest in a fair trial, and stepped back from the brink. With this trend in mind, we turn to the issue here of whether Maryland law should require the defendant to show bad faith by the police before he may receive a missing evidence jury instruction, or whether an alternative approach is warranted.

One way in which courts have avoided *Youngblood's* harsh result is not available in Maryland. In *Patterson*, we affirmed that Maryland's *constitutional protections* do not extend beyond *Youngblood*, nor apply in cases where the defendant cannot show bad faith by the police. *See Patterson*, 356 Md. at 694–96, 741 A.2d at 1128. As the *Patterson* Court performed a Maryland constitutional analysis, Cost cannot find direct assistance in the approaches of states whose constitutions provide the defendant additional due process protections, even though their discussions of the implications of *Youngblood* are instructive.

Yet our holding in *Patterson* did not definitively establish the limits of *substantive Maryland evidence law*, the other theory which may support a missing evidence instruction. In addressing the requirements of our Maryland evidence law, we stated in *Patterson* that trial courts "need not instruct . . . [on] *most* evidentiary inferences," and that "a party *generally* is not entitled to a missing evidence instruction," the very constructions of which imply that this is not an absolute rule. *Patterson*, 356 Md. at 694, 741 A.2d at 1127 (emphasis added).[8] This case may constitute the exceptional circumstance that the

---

8. The *Patterson* Court, moreover, cited favorably to at least three state courts—Alaska, Connecticut, and Delaware—which have required miss-

*Patterson* Court foresaw, one which compels a missing evidence jury instruction relating to an evidentiary inference. The emerging consensus among the states which have considered the issue—that to insure a fair trial, the missing evidence jury instruction in a criminal case should not be limited to the *Youngblood* bad faith standard—persuades us that we should take a careful look through the door that Patterson left open.[9]

### 3. Peeking Though the *Patterson* Open Door

▰▰▰▰▰ *Patterson* presented the "general" or "typical" case, likely to be repeated, in which some piece of crime scene

---

ing evidence instructions in certain circumstances or have rejected *Youngblood's* bad faith standard. *See Patterson,* 356 Md. at 691–693, 741 A.2d at 1126–1127 (*citing Riney v. State,* 935 P.2d 828, 839–40 (Alaska Ct.App.1997) (not an abuse of discretion under state evidence law to deny missing evidence instruction); *State v. Malave,* 250 Conn. 722, 737 A.2d 442, 446–49 (1999) (same); *and Cook v. State,* 728 A.2d 1173, 1176–77 (Del.1999) (same)). This reliance further undermines any interpretation of *Patterson* which would impose a "bad faith" requirement in all situations.

**9.** *Youngblood* later became the poster-child for this viewpoint. The defendant was later proven, by DNA evidence, to be wrongfully convicted. *See* Norman Bay, *Old Blood, Bad Blood, and Young Blood: Due Process, Lost Evidence, and the Limits of Bad Faith,* 86 Wash. U.L.Rev. 241, 243 (2008). As another commentator has described:

[After the Supreme Court decision,] Larry Youngblood remained in prison for many years. Following his parole and rearrest for failing to register as a sexual predator, [in the summer of 2000], Mr. Youngblood's appellate attorneys discovered a swab of semen that had been retrieved from the victim's skin at the time the crime occurred. It had been separated from the clothing, initially, but due to its minute size, had never before been tested, using the then existing inferior technology. When the swab was tested [that] summer, Larry Youngblood was exonerated.

What is extraordinary about Mr. Youngblood's case is that the doctrine requiring a showing of "bad faith" withstood the test of time for more than a decade. Think about the irony. In law school, we have been taught that, absent bad faith, the destruction of critical evidence will not be deemed prejudicial. As a result, there has been no requirement that law enforcement agencies use due diligence to preserve evidence. This doctrine rested for more than a decade on the shoulders of an innocent man.

Peter Neufeld, *Symposium: Serenity Now or Insanity Later?: The Impact of Post–Conviction DNA Testing On The Criminal Justice System,* 35 New Eng. L.Rev. 639, 646 (2001).

evidence, not of major import, was not retained or analyzed. It makes sense to hold, as *Patterson* did, that juries should not be instructed by the judge to wander down most pathways of evidentiary inference negative to the state based on evidence that is cumulative or not material and not usually collected by the police. Yet, this case is not typical, and the unusual facts here stand in stark contrast to those in *Patterson*. In *Patterson*, the missing jacket, although photographed, was never actually collected as evidence, nor was it likely to ever have been collected as evidence. *Id.* at 681, 741 A.2d at 1121. The arresting officers in that case testified that the jacket "was not the kind of evidence typically held as evidence by their agency, and that neither officer was aware of the jacket's current whereabouts." *Id.* at 681–82, 741 A.2d at 1121.

Here, by contrast, the crime scene, allegedly containing blood-stained linens and clothing, and dried blood on the floor, certainly would contain highly relevant evidence with respect to the crime for which Cost is charged, which normally would be collected and analyzed. Indeed, Brown's cell was sealed off from use, with the alleged crime scene left intact, pending IIU's investigation. Moreover, the missing items were actually held as evidence, completely within State custody. In fact, it appears from the record that at least some of these items were eventually submitted for laboratory examination, but were rejected because they were not submitted quickly enough, and because chain of custody was not properly preserved.

The evidence destroyed while in State custody was highly relevant to Cost's case. A factual issue at trial was whether Brown was, indeed, stabbed, and whether the alleged stabbing caused significant bleeding, as Brown insisted. While Cost was able to shed doubt on Brown's claim through Brown's medical records, he was prevented from supporting his case with laboratory analysis of Brown's clothing, towel, sheets, and the red substance on the floor of Brown's cell. Such evidence might well have created reasonable doubt as to Cost's guilt. This missing evidence could not be considered cumulative, or tangential—it goes to the heart of the case.

We are persuaded that under these circumstances a "missing evidence" instruction, which would permit but not demand that the jury draw an inference that the missing evidence would be unfavorable to the State, should have been given.

 To be sure, even absent the instruction, Cost could argue that the State's case was weak without this evidence. But argument by counsel to the jury will naturally be imbued with a greater gravitas when it is supported by a instruction on the same point issued from the bench. As we have previously said, "a statement or instruction by the trial judge carries with it the imprimatur of a judge learned in the law, and therefore usually has more force and effect than if merely presented by counsel." *Hardison v. State,* 226 Md. 53, 62, 172 A.2d 407, 411 (1961).

 We acknowledge that an instruction which informs a jury that it may consider a particular inference runs the risk of "creating the danger that the jury may give the inference undue weight ... [or of] overemphasizing just one of the many proper inferences that a jury may draw." *Davis v. State,* 333 Md. 27, 52, 633 A.2d 867, 879 (1993). Nonetheless, the purpose of a jury instruction is "to aid the jury in clearly understanding the case, to provide guidance for the jury's deliberations, and to help the jury arrive at a correct verdict." *Chambers v. State,* 337 Md. 44, 48, 650 A.2d 727, 729 (1994). If Cost had somehow destroyed the missing evidence here, the court would have likely instructed the jury that they may infer from this action that the evidence would have been favorable to the State. For the judicial system to function fairly, one party in a case cannot be permitted to gain an unfair advantage through the destruction of evidence. The application of the "missing evidence" inference against the State in this case, as promulgated through a jury instruction, will help ensure that the interests of justice are protected.[10] The application of

---

**10.** We do not suggest that the instruction requested by Cost, modeled upon the Maryland Criminal Pattern Jury Instruction ("MPJI–CR") on missing witnesses, best encapsulates the doctrine of spoliation in this context. *See* MPJI–CR 3:29. We recognize that various formulations

the missing evidence inference against the State in a criminal case does not by itself amount to "substantive proof that the evidence was unfavorable." *Bereano v. State Ethics Comm'n*, 403 Md. 716, 747, 944 A.2d 538, 556 (2008) (*citing DiLeo v. Nugent*, 88 Md.App. 59, 71, 592 A.2d 1126, 1132 (1991)). The instruction on missing evidence merely permits an evidentiary inference, and neither establishes a legal presumption nor furnishes substantive proof.

■■■ Our holding does not require a trial court to grant a missing evidence instruction, as a matter of course, whenever the defendant alleges non-production of evidence that the State might have introduced. Instead, we recommit the decision to the trial court's discretion, but emphasize that it abuses its discretion when it denies a missing evidence instruction and the "jury instructions, taken as a whole, [do not] sufficiently protect the defendant's rights" and "cover adequately the issues raised by the evidence." *Fleming*, 373 Md. at 433, 818 A.2d at 1121. In another case, where the destroyed evidence was not so highly relevant, not the type of evidence usually collected by the state, or not already in the state's custody, as in *Patterson*, a trial court may well be within its discretion to refuse a similar missing evidence instruction.

Because we hold that Cost was entitled to the requested jury instruction, we need not consider whether the failure to disclose Brown's medical history constituted a *Brady* violation. Cost will have the benefit of Brown's medical history on retrial.

## CONCLUSION

We hold that Cost was entitled to a jury instruction on the missing evidence because the State had destroyed highly relevant evidence in its custody that it normally would have retained and submitted to forensic examination. We remand the case to the Court of Special Appeals with instructions to

---

of the instruction could satisfy the requirements of our holding in this case.

vacate Cost's conviction, and to remand the case to the Circuit Court for Baltimore City for a new trial.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. REMANDED TO THAT COURT WITH IN-STRUCTIONS TO VACATE PETITIONER'S CONVIC-TION, AND TO REMAND TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR A NEW TRIAL. COSTS TO BE PAID BY THE STATE.**