[Crim. No. 4034. Fourth Dist., Div. Two. Oct. 7, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE ARNOLD VICK, Defendant and Appellant.

COUNSEL

Frank L. Williams, Jr., Public Defender, Russell P. Serber and James R. Goff, Deputy Public Defenders, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Laurence M. Sarnoff and Robert F. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

GABBERT, J.—In an information filed in the County of Orange, appellant was charged with the crime of murder, Penal Code, section 187. The public defender was appointed to represent appellant, and pleas of not guilty and not guilty by reason of insanity were entered. A jury trial was set. Appellant then moved for dismissal of the prosecution, which motion was denied. Appellant withdrew his pleas of not guilty and not guilty by reason of insanity, and entered a plea of guilty to the charge of murder in the second degree, a necessarily lesser and included offense within section 187 of the Penal Code. Appellant waived the right to make an application for probation and was sentenced to the state prison for the term prescribed by law. The trial judge certified there was probable cause for an appeal. This appeal is from the judgment of conviction.

### Facts

The appellant raises no question of the sufficiency of the evidence. The facts concerning the homicide are contained in police, coroner's and autopsy reports which were included in the record on appeal. Extensive stipulations covered additional facts and various contentions of the appellant.

Appellant met Susan Carol Adams, 20 years of age, and they started living together in her apartment on Pasadena Avenue. Appellant began supporting Susan and she terminated her employment. They made plans to go to Australia and appellant told Susan he was depositing money in her bank checking account.

On June 24, 1969, he told her they could not go to Australia, his money was gone and the checks she had written on her account were not covered. Susan became very upset over the bad checks she had unwittingly written. There was a disagreement and appellant told her he was leaving the state. The two of them met the same evening and attempted to arrange their financial affairs with the help of appellant's former employer. Later that night there was an argument whether appellant could continue to stay in the apartment until the financial matters were cleared up. Susan agreed to permit appellant to stay that night but said he would have to find another place to live the next day. Both parties were emotionally upset. As appellant and Susan were lying in bed, Susan was reading and both were drinking wine. Susan started crying, stating appellant "had ruined her life, had ruined her credit, and she might go to jail for the bad checks."

After considerable emotional quarreling appellant hit Susan on the head with a wine bottle. The lights were out and he was not sure where the blow was struck. Susan started screaming and appellant became frightened; he put his hand over her mouth to keep her from screaming, but she continued screaming, fighting, scratching and biting. She bit appellant's hand and he placed a piece of plastic over her mouth; she scratched him in the face and kicked him in the face and chest. Appellant hit her again in the jaw or the face and then held a plastic bag over her mouth until she stopped screaming. During this period they both rolled off the bed. Appellant picked her up and placed her on the bed, covering her with a blanket or bedspread.

About 1 a.m. on June 25th, appellant left the apartment to go to the police department. He saw a police car, became scared and went into a phone booth requesting the operator to send the police to the apartment. The operator asked him to stay on the line for the police, but he said he could not and asked to have the police sent to the address, which he repeated.

Immediately thereafter appellant twice attempted to take his own life by means of a garden hose connected to his car's exhaust system. On the second attempt three men on their way to work saw the car in an orange grove and removed appellant from the car. The police were called and observed appellant kneeling beside his car. As they approached, he stated he did not mean to kill Susan, saying he loved her. The police were aware

of the death on Pasadena Avenue and placed appellant under arrest for murder. This was about 6:05 a.m., on Wednesday, June 25, the same day as the death.

Coroner's officers were called to the apartment by the police and arrived at 2:35 a.m. The autopsy surgeon examined the body at the apartment between 3 and 3:30 a.m. An autopsy was begun at 6:30 a.m. by Robert G. Richards, M.D., the pathologist representing the coroner, and was completed by 8:30 a.m. The body was then turned over to the parents of the deceased. The coroner's office had no further control of Susan's body after 8:30 a.m. on June 25.

The following day, Thursday, June 26, a complaint alleging violation of Penal Code, section 187, was filed in the municipal court. On Friday, June 27, between 9:30 and 10 a.m., appellant appeared in municipal court for arraignment. The public defender was appointed and at the request of appellant arraignment was continued to Monday, June 30. Appellant was visited by a second deputy public defender, at the Orange County jail, on Friday afternoon. The funeral for the victim was held Saturday, June 28, at 10 a.m., followed immediately by cremation. On Monday, June 30, the deputy public defender learned of the funeral and the cremation.

After a preliminary hearing appellant was bound over to the superior court on a charge of murder. He entered pleas of not guilty and not guilty by reason of insanity, and the case was set for jury trial. The court appointed psychiatrists to examine the appellant.

On September 12, 1969, appellant filed a notice of motion for discovery relating to the coroner's records and reports and the motion was granted.

On October 1, 1969, in a proceeding agreed upon by the People and the appellant, a hearing on appellant's motion to dismiss was held. In connection with the motion, the facts set out above were stipulated to and other items were admitted into evidence for the purpose of the motion. The motion was denied. Appellant then withdrew his pleas of not guilty and not guilty by reason of insanity and entered a plea of guilty to a charge of murder in the second degree. He waived his right to probationary investigation and requested immediate sentence. He was sentenced to state prison for the term prescribed by law.

On application a certificate of probable cause was signed by the trial judge.[1]

---

[1]The court and counsel had discussed the procedure to be followed prior to the time the court ruled on the motion to dismiss. At that time the following statements were made:

"Mr. Serber (counsel for appellant): Yes, your Honor, and in that regard—not

The motion to dismiss and this appeal were based on two contentions:

(1) Appellant was deprived of due process of law and a fair trial because he was precluded from obtaining his own expert medical post-mortem examination of the deceased;

(2) Appellant was deprived of due process of law and a fair trial because he was not arraigned within two days of his arrest.

At the hearing on the motion to dismiss, stipulations were entered into between the district attorney and the public defender which are summarized as follows: The defendant desired an independent post-mortem examination of the body by his own expert and this was precluded by the cremation; if the cremation of the body had not been accomplished on June 28, appellant's counsel would have procured an expert to conduct a post-mortem examination; the coroner's office had no special rules or regulations in suspected homicide cases and the policy was to release the body to the next of kin after autopsy or the termination of investigation; the coroner's office did not check with law enforcement agencies before releasing the body. It was also stipulated appellant was furnished with the full coroner's post-mortem autopsy report, including black and white and color photographs, copies of all reports of the investigation and chemical tests, microscopic slides of tissue samples and all matters requested in appellant's motion for discovery. Further, it was stipulated the coroner's

---

trying to be lengthy—but to keep the record clear, this procedure has been discussed by myself and with Mr. Novick.

"We have agreed upon this procedure in the event that there is anything extraordinary about it.

"As the Court mentioned earlier, we have been in touch with the Court in regard to the mechanics of this situation. . . ."

"In regard to all the items which the Court just named, it is further understood between the prosecution and the defense that those matters are to be considered for the purposes of the motion only and, so that it is clear what we intend to do, motions are being made, and in the event of a denial of the motion there will be some further proceedings, naturally.

"The Court: Yes. I think that we didn't mention this, but I should make it clear that this has been discussed with me and it is sort of a different approach to a situation, and our understanding is that if I should deny the motion, thereafter there is going to be a plea of guilty, but in order for you to protect your client's interests in this I should make it clear that even after a plea of guilty I will sign a certificate of probable cause so that you may appeal after the plea of guilty, because that was what the whole arrangement was.

"Mr. Serber: That is correct.

"The Court: In case I make an unfavorable ruling to you at this time, you are entitled to test that ruling before the Appellate Court. You can't do it unless I do sign a certificate of probable cause, and I commit myself to you at the present time I will do so if there is a plea of guilty and if I deny the motion."

autopsy surgeon was a board-certified clinical and anatomical pathologist who had not received formal training in matters of death by suffocation, but had performed autopsies in suffocation cases; the appellant's medical expert was board-certified in clinical, anatomical and forensic pathology, had received formal training in suffocation death cases and had performed autopsies in such cases; the latter expert had examined the coroner's records and materials and would testify, if called as a witness, that Dr. Richards' findings were medically nonspecific.

### Denial of Independent Post-Mortem

Basically, appellant contends a dead body is evidence and the rules of discovery apply to it. He argues a defendant's right to examine the remains of the victim in a homicide case is not less than his right to run independent ballistic tests, fingerprints, or handwriting analyses.

At common law the accused in a criminal case could not compel production of evidence in the possession of the prosecution. In this state the common law has been relaxed. (See generally on criminal discovery, 49 Cal.L.Rev. 56, Louisell: *"Criminal Discovery: Dilemma Real or Apparent?"*) It is now recognized that the state has no interest in denying an accused access to all evidence lawfully in its custody which can throw light on issues in the case; however, pretrial discovery in favor of defendant is not required by due process considerations. In *Jones* v. *Superior Court,* 58 Cal.2d 56, 59-60 [22 Cal.Rptr. 879, 372 P.2d 919, 96 A.L.R.2d 1213], when discovery was permitted in advance of, as well as at the trial, the court was not acting under constitutional compulsion but to promote an orderly ascertainment of the truth.

In some cases the court has permitted the defendant to inspect parts of organs of the body of a human being or specimens or samples removed therefrom. In *Schindler* v. *Superior Court,* 161 Cal.App.2d 513, 519 [327 P.2d 68], the petitioner was allowed to inspect specimens taken by the autopsy surgeon. The petitioners sought a writ of mandate authorizing the exhumation of the victim's body for further autopsy examination. The court held the grant of discovery to the preserved specimens was based on the exercise of judicial discretion, not upon constitutional right.

There is a clear distinction between examination of physical evidence such as handwriting exemplars, fingerprints, written statements, and the body of a human being. The former are susceptible of examination without the likelihood of outrage to the emotional feelings of the living. As reflected in our laws, our society extends more respect to a dead body than to other physical evidence. (See Health & Saf. Code, §§ 7052,

7114.) While the state has no interest in the denial of the type of discovery sought herein, further outrage to the family of the victim may be prevented by such denial. (See *Delay in Delivery of Cadaver to Next of Kin* (1967) 16 Clev.-Mar. L. Rev. 166.)

In *Commonwealth* v. *Bartolini*, 299 Mass. 503 [13 N.E.2d 382] cert. den. (1938) 304 U.S. 565 [82 L.Ed. 1531, 58 S.Ct. 950], the accused in a murder prosecution requested permission for his counsel, in company with necessary experts, to examine within a reasonable time before the commencement of trial the parts of the body and the material in which they had been wrapped, the report of the medical examiner, and all property and other materials taken by the state from the premises occupied by the deceased, and from the premises of the defendants, and all fingerprints taken by the state at the premises of the deceased. It was held denial of the motion did not violate due process where all tangible objects were offered in evidence, except the parts of the body, and there was nothing to show the state had those parts in its possession at the time the motion was filed. In the present case, there is no contention that the body of the victim was in the possession of the prosecution at any time.

Appellant contends Health and Safety Code, section 7102[2] compels the coroner to give a defendant notice of availability of and access to a dead body in a suspected homicide case. The code section refers only to the right of custody of the body by the coroner for purpose of autopsy or investigation, not to any other person or official. After autopsy or investigation is completed by the coroner the right to control disposition of the remains of a deceased, and the duty of interment devolve as provided by law. (Health & Saf. Code, § 7100.) In this case they devolved on the surviving parents of the deceased, who were entitled to custody of the body immediately upon the conclusion of the autopsy or medical investigation by the coroner. (Health & Saf. Code, *supra*, § 7102.) No statutory duty required the coroner to notify appellant the body of deceased was available for an independent autopsy. Appellant had no statutory right to compel the parents of the deceased to make the body available for examination after its surrender to them by the coroner.

Appellant contends the practice of the Orange County Coroner's office

[2]Health and Safety Code, section 7102 provides as follows: "When a person is charged by law with the duty of interment he is entitled to the custody of the remains for the purpose of interment or, with respect to cremated remains, for the purpose of burial at sea in accordance with the provisions of this division; except that in any case where a coroner is required by law to investigate the cause of death, the coroner is entitled to the custody of the remains of the person whose death is the subject of investigation until the conclusion of the autopsy or medical investigation by the coroner. Any person in whose possession such remains are found, shall, upon demand by the coroner, surrender such remains to him."

is to retain the remains of a murder victim if contacted by defendant's attorney. It is asserted the remains should be preserved by the coroner for a period of time adequate to give counsel an opportunity to make a decision as to whether or not to have the body examined. Assuming, *arguendo,* such practice is followed, it is not required by law and appellant was not deprived of any legal right by the delivery of the body to the parents. The records before us are devoid of any facts which would serve to indicate the coroner, in turning over the custody of the body to the parents of the deceased, was acting to forestall or prevent appellant from examining the remains.

Appellant relies on the case of *United States* v. *Heath,* 147 F.Supp. 877, as establishing the contention he was denied a fair trial because the body of deceased was unavailable, and since such evidence could not be produced in court, the case should have been dismissed. In *Heath,* the defendant was indicted for income tax evasion. The defendant made a discovery motion which was granted, but the Internal Revenue Service was unable to comply with the order because the account books had been lost by the government agents. The defendant contended these records were necessary to establish the fact his errors were made without criminal intent. The court granted defendant's motion to dismiss.

The case before us is distinguishable. In *Heath,* the lost evidence was the only means by which the defendant could prove his defense. In this case appellant was supplied with the autopsy protocol, from which he could examine or cross-examine the autopsy surgeon. He was also given access to all physical evidence preserved by the autopsy surgeon and the coroner's investigation report. Further, in *Heath* the government became the custodian of the records, while in this case the coroner was legally entitled to the custody of the victim's body only until he had completed his autopsy and examination.

*United States* v. *Consolidated Laundries Corp.,* 291 F.2d 563, 570, cited by appellant, is also distinguishable because the government was the custodian of negligently suppressed documents, and was under a duty to keep the evidence in such manner so that it would be available for use upon the trial by all parties.

A trial court has the discretion to allow discovery by a criminal defendant, including the examination of a body in some circumstances. However, this court will not judicially legislate, as suggested by appellant, requiring that a coroner retain possession of a body until a defendant requests permission to conduct his own autopsy examination. Due process does not compel such a ruling.

## Delay in Arraignment

█ Appellant was arrested Wednesday, June 25, at 6:05 a.m. and arraigned in municipal court Friday, June 27, about 9:30 a.m. The period of time between arrest and arraignment was thus approximately 52 hours.

The California Constitution (art. I, § 8) provides, in part, that "When a defendant is charged with the commission of a felony . . . he shall, without unnecessary delay, be taken before a magistrate. . . ." Section 825 of the Penal Code provides: "The defendant must in all cases be taken before the magistrate without unnecessary delay, and, in any event within two days after his arrest, excluding Sundays and holidays; provided, however, that when the two days prescribed herein expire at a time when the court in which the magistrate is sitting is not in session, such time shall be extended to include the duration of the next regular court session on the judicial day immediately following."

The Attorney General argues that if the period of "two-days" as those words are used in Penal Code, section 825, is interpreted to mean 48 hours, appellant was arraigned after "two-days" had expired, but the time expired at a time when the court was not in session; therefore the time limit set forth in section 825 was extended to include the duration of the next regular court session.

Respondent in the case of *People* v. *Lee,* 3 Cal.App.3d 514 [83 Cal. Rptr. 715], made a similar contention. The court held that in a situation wherein a 48-hour period after arrest expires at a time when court is not in session, the time for arraignment is extended to include the duration of the next regular court session. The court further noted, citing *People* v. *Powell,* 67 Cal.2d 32, 59 [59 Cal.Rptr. 817, 429 P.2d 137], that under certain circumstances even a delay within the statutory time may be unreasonable.[3]

---

[3]The following language in *Powell,* is pertinent:

"It is true that the federal rule of *McNabb* v. *United States* (1943) 318 U.S. 332 [87 L.Ed. 819, 63 S.Ct. 608], i.e., that any confession obtained during an illegal detention is ipso facto inadmissible, has not been adopted in California (*Rogers* v. *Superior Court* (1955) 46 Cal.2d 3, 10 [291 P.2d 929]), and that a violation of a defendant's right to be taken before a magistrate without unnecessary delay does not require reversal 'unless he shows that through such wrongful conduct he was deprived of a fair trial or otherwise suffered prejudice as a result thereof' (*People* v. *Combes* (1961) 56 Cal.2d 135, 142 [14 Cal.Rptr. 4, 363 P.2d 4], and cases there cited). But these holdings must not be misconstrued as acquiescence on our part in any continuation of such unlawful practices. The Constitution and the several statutes quoted above are clear and explicit on this point, and must be obeyed. . . . (Pp. 59-60.)

"In the case at bar the delay was used to 'extract' from these defendants not one but fourteen self-incriminating statements even though two had already been voluntarily given. Proper investigative procedures, such as scientific analysis of the physical evidence, were no doubt also undertaken during this period; but they could equally

The delay in the arraignment of a defendant in violation of section 825, Penal Code, has been held not to require a reversal unless such delay prevented a fair trial, affected the outcome of the trial, or caused the defendant to suffer prejudice. (*People* v. *Wilson,* 60 Cal.2d 139, 154 [32 Cal.Rptr. 44, 383 P.2d 452]; *People* v. *Combes, supra; People* v. *Lee, supra; People* v. *King,* 270 Cal.App.2d 817 [76 Cal.Rptr. 145].)

We have considered the reports, records and exhibits forwarded to this court and the stipulations entered into between the parties. The facts established in such records are clearly distinguishable from those in *Powell.* In the present case, appellant freely gave information before he was arrested both to the police and to laymen indicating he had killed Susan. After a *Miranda* warning had been read to him, he indicated that he fully understood his legal and constitutional rights,[4] and stated he had done the killing. ". . . I hit her with a bottle." He reiterated these statements several times to persons other than law enforcement officers. None of the coercive interrogation techniques that were used in *Powell* to trap the defendant and compel confession were used. No continuous questioning followed. The records do not indicate any effort to question appellant other than the initial interview which, according to the records, was accomplished before 7 a.m. the day of his arrest. The statements made by appellant do not come within the sphere of critical concern expressed in *Powell.*

Nor does there appear to be any causal connection between any delay in arraignment and the asserted right of appellant to have his own expert perform a post-mortem examination on the body of the deceased. Assuming that a court could have made orders for appellant's counsel and an expert pathologist to be present at an autopsy as observers or otherwise, such situation did not exist in this case. The body had been turned over to the next of kin almost from the time appellant was first taken into custody. Nothing before us establishes the likelihood that anything more would have been done than was actually done by appellant before the body was cremated. Counsel for appellant was appointed early Friday morning before the

well have been pursued after arraignment, and do not justify holding defendants virtually incommunicado. The intent of the police in doing so, it clearly appears from the record, was to permit repeated interrogation of defendants until they condemned themselves out of their own mouths and provided the prosecutor with an airtight case against them." (Pp. 60-61.)

In *Powell,* a reversal was necessitated by the *Escobedo* and *Dorado* rules. The court stated that it ". . . need not decide at this time whether the circumstances just described amounted to such prejudice as to render reversible the denial of defendants' constitutional and statutory rights to prompt arraignment. But we cannot condone such conduct by the police, and any repetition thereof will be closely scrutinized." (P. 61.)

[4]The appellant stated: "I know my rights, I don't care, yes, I understand . . ." "What's there to talk about, I did it, I killed her. Yes, I'll tell you about it."

funeral and the cremation of the remains. After counsel was appointed more than 24 hours elapsed before cremation. No steps were taken during this period to seek any delay in disposition of the body.

All that appellant offers is speculation: *If* the coroner had not surrendered the body to the family and *if* appellant had been arraigned at an earlier time, *something* (we are not told what) might have been done. Clearly, the coroner could not have been ordered to retain custody of the remains because he had relinquished such custody to the family before the courts were even opened on the day of appellant's arrest. Since appellant himself admits in his brief that "A request of the coroner's office would have been a vain act after 8:30 a.m., Wednesday, June 25, 1969," any delay in arraignment, to be considered unreasonable, must have prevented him from obtaining legal relief which would have stayed the cremation on Saturday.

Appellant contends by the delay in arraignment he was denied the right to meaningfully cross-examine the prosecution's medical expert, and cites the case of *People* v. *Fowler,* 1 Cal.3d 335 [82 Cal.Rptr. 363, 461 P.2d 643]. *Fowler* is an analysis of the right to counsel at lineups, and discusses in detail the case of *United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]. The *Wade* case, itself, distinguished lineups from other scientific examinations and investigations as follows: "The Government characterizes the lineup as a mere preparatory step in the gathering of the prosecution's evidence, not different—for Sixth Amendment purposes—from various other preparatory steps, such as systematized or scientific analyzing of the accused's fingerprints, blood sample, clothing, hair, and the like. We think there are differences which preclude such stages being characterized as critical stages at which the accused has the right to the presence of his counsel. Knowledge of the techniques of science and technology is sufficiently available, and the variables in techniques few enough, that the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts." (Pp. 227-228 [18 L.Ed.2d at pp. 1157-1158].)

If this matter had proceeded to contested hearing appellant's counsel would have been able to present any defense that he possessed through cross-examination of the autopsy surgeon, by the independent examination of the preserved samples and microscopic slides, and through the presentation of the opinion evidence of his own expert. There was no denial of effective aid of counsel.

This is not a case of suppression of evidence. Appellant cites the cases of *Miller* v. *Pate,* 386 U.S. 1 [17 L.Ed.2d 690, 87 S.Ct. 785]; *Brady* v.

*Maryland,* 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194]; *People* v. *Hall,* 62 Cal.2d 104 [41 Cal.Rptr. 284, 396 P.2d 700]; *People* v. *Kiihoa,* 53 Cal.2d 748 [3 Cal.Rptr. 1, 349 P.2d 673]; *People* v. *Carter,* 48 Cal.2d 737 [312 P.2d 665] as holding the suppression by the prosecution of evidence favorable to an accused violates due process, where the evidence is material to guilt or punishment, irrespective of the good or bad faith of the prosecution. In *Brady, supra,* defense counsel requested to see an accomplice's statements. An important document in which the accomplice admitted the commission of the homicide was withheld by the prosecution. In the case before us nothing was withheld from appellant, the district attorney's entire file was made available to defense counsel. The fact the body of the victim was released to her parents shows no intent to suppress evidence. In *Miller* v. *Pate, supra,* there was deliberate misrepresentation of the truth with respect to physical evidence by the district attorney. Here no such misrepresentation of truth is involved. In *People* v. *Hall, supra,* the police denied defendant's request to call counsel and failed to make tests which might have been probative of innocence or guilt. In this case a comprehensive autopsy was performed and appellant's confession was totally consistent with and corroborated by the findings of the autopsy surgeon.

In *People* v. *Kiihoa, supra,* cited by appellant, the prosecution delayed trial until an informer who participated in the crime had left the jurisdiction of the court. It was properly held that a fair trial is denied where the delay was planned so the trial could take place after the witness was unavailable. Such action constituted intentional suppression of material evidence. The court in *Kiihoa* indicated the unavailability of a material witness would not necessarily result in a denial of due process in every case. We do not find a direct analogy can be drawn between the unavailability of a material witness and the inability of an accused to perform an independent postmortem examination. In the instant case, the pathologist was available for cross-examination; all reports were made accessible to defense counsel, the tissue specimens and microscopic slides were preserved and were at hand for the defense. There was no intentional suppression of material evidence.

In *People* v. *Carter, supra,* the defendant contended that he had requested the district attorney to allow a defense criminologist inside certain premises where the murder had occurred for the purpose of his own expert examination. The district attorney delayed until the premises had been cleaned up and an inspection by the defense expert would have been a vain act. The court stated: "If these allegations be true, the State may have disabled itself from ever giving defendant a fair trial." (P. 747.) No such action by the prosecution took place in the instant case. The release of the body to the next of kin was done in compliance with Health and Safety

Code, section 7102. The record discloses no deliberate destruction of material evidence, nor does it reveal the coroner's office was even aware of the arrest of the appellant at the time the body of the decedent was released.

We find the delay in arraignment did not prejudice the appellant and it did not prevent him from having the opportunity to have a fair trial.

### Applicability of the Rule of Boykin and Tahl

Although appellant has not raised the issue, the Attorney General, most fairly, has called our attention to the fact that the taking of the plea of guilty herein may not have fully conformed to the requirements of *In re Tahl,* 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449], as it has interpreted the case of *Boykin* v. *Alabama,* 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]. The latter case has determined that before a plea of guilty can be constitutionally allowed the record must show the defendant knowingly and intelligently waived, specifically, each of the rights forfeited as a consequence of that plea.

The taking of the plea of guilty in the case before us occurred after the decision in *Boykin* and before that of *Tahl.*

While *Boykin* sets no explicit requirements, in the *Tahl* case the California Supreme Court has indicated that special waivers must be obtained from a defendant and appear in the record to establish a valid plea of guilt. Prior to the acceptance of a guilty plea, three federal constitutional rights involved in a waiver when a plea of guilty is entered must be expressly stated. These are: (a) the privilege against compulsory self-incrimination, (b) the right to trial by jury, and (c) the right of a defendant to confront his accusers.

Inasmuch as the record before us is silent as to any waiver of the right to trial by jury we are compelled to hold that the record is insufficient under *Boykin.* Since the California Supreme Court has held that *Boykin* must be given prospective application and since we find that the *Boykin* case is applicable, this procedural error necessitates a reversal of the case.

Because the record is silent with respect to any waiver by appellant of his right to trial by jury, it is not necessary for the decision of this case to consider whether or not appellant was informed of the consequences of the waiver of his rights as to compulsory self-incrimination and the confrontation of witnesses against him. The transcript does show there was

considerable general discussion of the right of confrontation because that issue was a paramount one before the court on the motion to dismiss. In any event, on a rearraignment and further proceedings, all of the constitutional rights and waivers discussed in *Boykin* and *Tahl* can be fully explained to appellant if it is required as the case proceeds.

The judgment of conviction is reversed.

Tamura, Acting P. J., and Kerrigan, J., concurred.

A petition for a rehearing was denied October 20, 1970, and respondent's petition for a hearing by the Supreme Court was denied December 3, 1970.