**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1298

September Term, 2013

ROBERT ARNOLD JARRETT, JR.

v.

STATE OF MARYLAND

Berger,
Nazarian,
Leahy,

JJ.

Opinion by Berger, J.

Filed: December 17, 2014

On January 3, 1991, Christine Jarrett ("Christine"), age thirty-four, went missing. Twenty-one years later, on April 18, 2012, skeletal remains later identified as Christine's were found buried under the backyard shed of the home on Claire Drive in Howard County in which Christine had previously resided with her husband, Robert A. Jarrett, Jr. ("Jarrett"). In the evening of April 18, 2012, Jarrett was placed under arrest. Jarrett was subsequently charged with murder and associated crimes relating to Christine's death. Following a jury trial, Jarrett was convicted of second-degree murder.

On appeal, Jarrett raises four issues for our review, which we have rephrased slightly as follows:

1. Whether the circuit court erred by permitting the State to play for the jury certain recordings of jail calls between Jarrett and his son.

2. Whether the circuit court abused its discretion by declining to give a jury instruction on the gross negligence variation of involuntary manslaughter.

3. Whether the circuit court abused its discretion by giving a concealment of evidence jury instruction.

4. Whether the circuit court abused its discretion by declining to give a "missing evidence" jury instruction.

For the following reasons, we answer each question in the negative. Accordingly, we shall affirm the judgment of the Circuit Court for Howard County.

**FACTS AND PROCEEDINGS**

The following evidence was adduced at trial. Jarrett and Christine were high school sweethearts who married in 1974. In 1983, they moved to 6050 Claire Drive, in the Elkridge

area of Howard County. They had two children, Robert Jarrett, III ("Bobby") and Michael Jarrett, ages ten and five, respectively, at the time of Christine's disappearance in 1991. Jarrett worked in the HVAC industry, and Christine was employed in a factory until she suffered a work-related injury in the late 1980s, after which she became a full-time homemaker.

The Jarretts' marriage suffered from frequent quarrels over money, and both Jarrett and Christine had engaged in extramarital affairs. Bobby described his parents' marriage as "tumultuous" and saw his father push his mother to the floor during an argument on at least one occasion. Christine's friends, Donna Madera, Marsha Smallwood, Cindy Fryer, and Cindy Travis, were aware of Christine's unhappiness with respect to her marriage. Christine had made comments to Madera and Smallwood about wanting to leave and not return, but, according to Christine's friends, Christine was a devoted mother who would not have left her sons.

Patricia Mueller, Christine's sister, remembered a particular altercation between Christine and Jarrett in June of 1990. Christine called Patricia and Patricia's son, David, in tears and asked them to pick her up from a nearby drugstore. Patricia and David went to pick up Christine. When they arrived at the drugstore, the side of Christine's face was red and swollen, Christine had a cut on the bridge of her nose, and Christine's glasses were broken. Christine told Patricia and David that Jarrett and she had argued about an outfit she planned to wear to a neighborhood barbeque. Christine further described how Jarrett had grabbed and

2

beaten her. Patricia and David encouraged Christine to go to the emergency room and seek medical attention for her injuries, but Christine refused, saying that she did not want to get Jarrett in trouble.

On January 4, 1991, when Bobby woke up to get ready for school, Christine was nowhere to be found in the family's home. Bobby saw Jarrett sleeping on top of the covers of the bed, fully dressed. Bobby remembered thinking it was unusual for Jarrett to be home on a weekday. In the evening of January 4, 1991, Jarrett contacted neighbors and friends, explaining that he was looking for Christine because she had left the previous evening following an argument and failed to return. Jarrett contacted the police after he learned that none of Christine's friends had heard from her.

The following day, Officer Thomas O'Connor met with Jarrett. Jarrett completed a missing persons report. Officer O'Connor noted that Jarrett was "extremely concerned and emotional." The case was turned over to Detective Steve Greisz after Christine failed to return within several days. Detective Greisz met with Jarrett on January 7, 1991. Jarrett told Detective Greisz about Christine and Jarrett's history of marital discord, including a separation for several months in mid-1990. Jarrett told Detective Greisz that on the evening of January 3, 1991, Christine and he had argued about finances. According to Jarrett, he went to sleep in the basement following the argument. Later that evening, Jarrett went up to the bedroom, but Christine was not there. Jarrett explained that Christine had not returned the next morning. Jarrett showed Detective Greisz a bank withdrawal slip showing that

3

Christine had withdrawn $4,200.00 in cash from a bank account in mid-December of 1990. In his report, Detective Griesz noted, "no physical, no push, in past -- yes -- hit her."

Detective Greisz continued to investigate Christine's disappearance by meeting with Christine's friends and family members. On January 9, 1991, Detective Greisz met with Norman Raines, a former high school friend of Christine's with whom Christine had a brief affair in 1990. Raines told Detective Greisz that he had spoken to Christine on several occasions in late 1990, but initially, Raines did not mention a sexual relationship. Raines told Detective Greisz that he was engaged in recreational "shooting" at Fort Meade on January 3, 1991. When Detective Greisz met with Raines again on September 25, 1991, Raines acknowledged that Christine and he had engaged in sexual relations in October of 1990. Raines told Detective Greisz that Christine had initially contacted him in the summer of 1990. According to Raines, Christine would call him once a week and tell him she loved him. Raines further explained that Christine and he had several lunches together. Raines acknowledged that Christine had told him that she "sometimes" thought about taking her money and leaving town.

Raines was called as a witness by the defense at trial and testified that he had a brief affair with Christine in 1990. He further testified that the last time he saw Christine was on December 21, 1990. Raines denied killing Christine or burying her body.

Forensic analysis performed at the Jarretts' home of the basement, stairs, and a mobile home owned by the Jarretts tested negative for blood. Detective Greisz testified that, to the

4

best of his recollection, he had not gone around the outside of the Jarrett property. Christine's medical and dental records were entered into a missing persons database and, within a year, the investigation was classified as inactive.

Jarrett began a relationship with Martha Jarrett ("Martha"), his second wife, some months after Christine's disappearance. Jarrett told Martha that his relationship with Christine had not been "healthy" and that Christine and he had discussed divorce before Christine went missing. Martha and Jarrett married in June 1993 and their daughter was born in October 1993. Martha had a difficult relationship with Jarrett's sons and, as a result, Bobby moved out of the home in 2005. Martha and Jarrett ultimately separated in or around December 2011. Jarrett vacated the home on Claire Drive while Martha continued living at the home.

Jarrett's siblings, Brian and Donna, did not have a good relationship with Martha. On January 25, 2012, Jarrett engaged in a relevant email conversation with Brian and Donna. A printout of the email thread was admitted into evidence at trial. The siblings were discussing a location for a family dinner. The following conversation occurred:

> Jarrett: Yanna, You better hurry up with the Kitchen project cause Char[1] said something Sunday about our next dinner date with gf[2] was going to be at your house next.
>
> Donna: Lock Martha in the shed and have it on Claire Drive.

---

[1] "Char" was a reference to Charlotte, Jarrett's mother.

[2] "Gf" was a reference to Jarrett's new girlfriend.

5

> Brian: Oh my.
>
> Donna: Was that wrong?
>
> Jarrett: I might need a bigger shed, its [sic] getting crowded in there, should I put her beside the one that's already in there?
>
> Brian: It wouldn't be soon enough!

Brian testified that "Yanna" was a nickname Jarrett used for their sister, Donna, and that no one else used that nickname. Brian further testified that he interpreted Jarrett's comment to be a joke.

Special Investigator Nicholas DeCarlo had assumed responsibility for Christine's case by 2005. Investigator DeCarlo was a retired detective from Montgomery County who was employed in a civilian capacity by the Howard County Police to investigate cold case homicides. In April 2012, Investigator DeCarlo became aware that Martha and Jarrett had separated and that Jarrett had left the Claire Drive residence. On April 17, 2012, Investigator DeCarlo went with Detective J. Daniel Lenick to meet with Martha at the home. They explained that they were investigating Christine's disappearance and asked for permission to search the property, including the shed and the ground beneath it. Martha consented to the search. During their search, Investigator DeCarlo and Detective Lenick observed that the shed had plywood floors and determined that additional tools were needed. They secured permission from Martha to return the following day with appropriate tools.

Investigator DeCarlo and Detective Lenick returned the following morning accompanied by a forensic technician. They removed the plank flooring of the shed and

6

found approximately six inches of gravel below. They continued to dig and discovered a four-foot by two-foot, oval-shaped concrete slab with material embedded inside. They found what appeared to be human bone and stopped the excavation until a search warrant could be obtained.

A warrant was secured later that day. Investigator DeCarlo, Detective Lenick, and Office of the Medical Examiner ("OME") representatives returned to the Claire Drive residence and continued the excavation. Skeletal remains were found under the concrete block. Dr. William Rodriguez, an independent consultant for the OME and an expert in the area of forensic anthropology, supervised the removal of the remains. The deceased appeared to have been wearing a Disney shirt but had no undergarments or shoes. Personal items were recovered adjacent to the remains, including a jacket, jewelry, purse, eyeglasses, photos of family members, and a Mickey Mouse wallet containing photographs and the name "Michael" in child-like handwriting. Several of the personal items were identified by Christine's family members as items that belonged the Christine, and various individuals confirmed that Christine had visited Disney World multiple times and often brought back Disney souvenirs.

Following the recovery of the remains, Jarrett was placed under arrest on the evening of April 18, 2012.

An autopsy was performed on April 19, 2012 by Assistant Medical Examiner Dr. Patricia Aronica-Pollack. Dr. Aronica-Pollack identified the deceased as Christine by

comparing the teeth to Christine's dental records. Evaluation of the skeletal remains showed no signs of trauma, asphyxiation, or disease. Dr. Aronica-Pollack was unable to ascertain a cause of death, but she did determine that the manner of death was homicide. At trial, Dr. Aronica-Pollack testified that there are "homicidal causes of death" that cannot be determined in circumstances when "the soft tissues are gone." Dr. Aronica-Pollack explained that it is possible for a person to have died from a gunshot wound, stabbing, blunt force trauma, or asphyxiation without any damage to the bones. Dr. Aronica-Pollack issued an informal report to Investigator DeCarlo and the State's Attorney on May 2, 2012 and issued her official written report on June 7, 2012.

After the autopsy was complete, the OME released Christine's remains to the family. Bobby and Michael planned to cremate the remains, but they contacted Investigator DeCarlo before pursuing the cremation to ask whether it was acceptable to proceed with the cremation. Investigator DeCarlo advised Bobby that cremation would not interfere with the investigation. Christine's skeletal remains were cremated shortly thereafter.

Jarrett's case proceeded to trial on April 9-23, 2013. Jarrett was convicted of second-degree murder and sentenced to thirty years' incarceration. This timely appeal followed.

Additional facts will be included as necessitated by our discussion of the issues.

## DISCUSSION

## I.

At trial, the State sought to play recordings of certain telephone calls between Jarrett and his son, Michael, for the jury. In one conversation, Michael asked Jarrett to assist "money-wise" for the cremation of "mom." Jarrett agreed to help with cremation expenses. Defense counsel objected to the conversations being played for the jury, arguing that the defense was unable to cross-examine Michael. Defense counsel further argued that the conversations included inadmissible hearsay. The prosecutor countered that Michael's statements were not hearsay because they were not being offered for the truth of the matter asserted. The prosecutor further argued that Jarrett's statements were admissible as tacit admissions.

The trial court permitted the recordings to be played, ruling as follows:

> But the argument and I'm accepting it so we're getting near the end of this, is that by not saying, you want money from me to cremate somebody I don't know, is an admission, tacit admission that he knows whose remains they are and that he agrees that they're the mother's remains because that's what he's been told and he's been asked to finance or contribute to the cremation. That's the argument. Also, I'll note, during opening the Defense told the jury that the State destroyed the evidence. You used the word destroyed the evidence. And the State I think has a -- is permitted to indicate that the Defendant, either individually or the Defense as a group but certainly the Defendant was aware of the impending disruption, if that's what the Defense wants to use. I don't use that word but the impending cremation. So I think it's admissible for two different reasons. Any final words? I'm going to overrule the objection and allow it in[.]

9

Recordings of portions of four telephone calls were played for the jury, and transcripts of the recordings were entered into evidence.

On appeal, Jarrett asserts that the trial court erred by permitting the April 24, 2012 conversation to be played for the jury. First, Jarrett argues that the conversation was not relevant. Second, Jarrett argues that the conversation contained inadmissible hearsay and the tacit admission exception to the hearsay rule does not apply. In response, the State argues that the conversation contained relevant information. The State further contends that the statements made by both Michael and Jarrett were not hearsay because they were not offered for the truth of the matter asserted. In the alternative, the State argues that if Jarrett's statements were hearsay, they were admissible under the party-opponent exception to the hearsay rule. We agree with the State that the recordings were admissible.

The April 24, 2012 telephone conversation that was played for the jury included the following exchange:

> Michael: Um, Bobby got a phone call from the M.E. today and they released mom's remains and I think we're going to . . . you there?
>
> Jarrett: Yeah, I'm listening.
>
> Michael: Oh, okay, um, I think we're going to go ahead and get her cremated, um, Frank's helping us out with all that kind of stuff.
>
> Jarrett: Um-hum.
>
> Michael: Would you be able to help us out with that?

10

Jarrett: Money-wise?

Michael: Yeah[.]

Jarrett: Yeah, how much you looking at?

Michael: I don't know, I don't know yet, that's (inaudible) but
I mean, I'll let you know . . .

Jarrett: Okay[.]

Michael: before we do anything.

Jarrett: Yeah[.]

Michael: Okay, alright.

Jarrett: How, how soon is all that going to happen?

Michael: Um, well, the funeral home has her now.

Jarrett: Has what?

With respect to the relevance of the telephone conversation, we note that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401. The issue of whether the skeletal remains were, in fact, Christine's remains was raised at trial, and defense counsel had further argued that evidence was "destroyed" when the remains were cremated "before [the defense] could get it." The telephone recording was relevant because Jarrett arguably acknowledged that the remains were Christine's by agreeing to contribute financially to the expenses for the cremation of "mom." Furthermore, the telephone recording was relevant to show that Jarrett

11

was aware that his sons were planning to move forward with Christine's cremation. Jarrett, however, did not ask his sons to delay the cremation, nor did Jarrett take any other steps to postpone the cremation. Accordingly, the trial court did not err by determining that the telephone recording was relevant.

Turning to Jarrett's contention that the recording contained inadmissible hearsay, we note that all out-of-court statements are not necessarily hearsay. "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5-801(c). "Except as otherwise provided by [the Maryland] rules or permitted by applicable constitutional provisions or statutes, hearsay is not admissible." Md. Rule 5-802. Despite the general rule against hearsay, certain out-of-court statements are admissible. Indeed, we have explained that "[a]n out-of-court statement is admissible *if it is not being offered for the truth of the matter asserted* or if it falls within one of the recognized exceptions to the hearsay rule." *Handy v. State*, 201 Md. App. 521, 539 (2011) (quoting *Conyers v. State*, 354 Md. 132, 158 (1999)) (emphasis added).

Our review of the record reveals that none of Michael's statements in the recording were offered for their truth. Michael's statements were not offered to prove that Michael and Bobby were planning to have Christine's remains cremated, that Frank was helping with arrangements, or that the funeral home had the remains at the time. Rather, Michael's statements were offered to show their effect on Jarrett. Accordingly, because Michael's

12

statements were offered for a non-hearsay purpose, the circuit court did not err in admitting them.

With respect to Jarrett's statements, several of the statements were not offered for the truth of the matter asserted. Several of the phrases uttered by Jarrett were questions rather than statements. Jarrett's questions could not have been admitted for the truth of the matter asserted because the questions did not assert any truth. Rather, the questions asked by Jarrett were introduced to prove that Jarrett, in fact, asked those particular questions of Michael. To the extent that Jarrett's statements constitute hearsay, however, they are admissible as statements of a party-opponent. Maryland Rule 5-803(a) provides that "[a] statement that is offered against a party and is: [t]he party's own statement, in either an individual or representative capacity" is excluded from the hearsay rule. Accordingly, Jarrett's statements, which were offered into evidence by the State, were admissible. Because the telephone recordings contained relevant evidence, which was admissible either as non-hearsay or as an exception to the rule against hearsay, the trial court did not err or abuse its discretion by admitting the telephone recordings into evidence.

## II.

Jarrett's second contention is that the circuit court erred by denying his request for a jury instruction on the gross negligence form of involuntary manslaughter. Maryland Rule 4-325(c) provides that "[t]he court may, and at the request of any party shall, instruct the jury as to the applicable law[.]" We review "a trial court's refusal or giving of a jury

13

instruction under the abuse of discretion standard." *Stabb v. State*, 423 Md. 454, 465 (2011).

The Court of Appeals has explained:

> We consider the following factors when deciding whether a trial court abused its discretion in deciding whether to grant or deny a request for a particular jury instruction: (1) whether the requested instruction was a correct statement of the law; (2) whether it was applicable under the facts of the case; and (3) whether it was fairly covered in the instructions actually given.

*Id.* (citing *Gunning v. State*, 347 Md. 332, 351 (1997)). "The burden is on the complaining party to show both prejudice and error." *Tharp v. State*, 129 Md. App. 319, 329 (1999), *aff'd*, 362 Md. 77 (2000).

When determining whether the trial court abused its discretion by declining to give a particular jury instruction, we consider the following:

> Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. Where the decision or order [of the trial court] is a matter of discretion it will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.

*Bazzle v. State*, 426 Md. 541, 549 (2012) (quoting *Stabb*, *supra*, 423 Md. at 465 (quoting *In re Don Mc.*, 344 Md. 194, 201 (1996))).

In the present case, the parties do not dispute that Jarrett's proposed instruction on the gross negligence variation of the involuntary manslaughter was a fair statement of law that was not otherwise covered in the instructions actually given. The only question is whether

14

the gross negligence variation of the involuntary manslaughter instruction was applicable under the facts of the case. The requested instruction, Maryland Criminal Pattern Jury Instruction 4:17:8B (2nd ed. 2012), provides:

> The defendant is charged with the crime of involuntary manslaughter. In order to convict the defendant of involuntary manslaughter, the State must prove:
>
> (1) that the defendant acted in a grossly negligent manner; and
>
> (2) that this grossly negligent conduct caused the death of (<u>name</u>).
>
> "Grossly negligent" means that the defendant, while aware of the risk, acted in a manner that created a high risk to, and showed a reckless disregard for, human life.

Regarding when a particular instruction is generated by the evidence, the Court of Appeals has explained:

> A requested jury instruction is applicable if the evidence is sufficient to permit a jury to find its factual predicate. As we said in *Dishman v. State*:
>
> > The threshold determination of whether the evidence is sufficient to generate the desired instruction is a question of law for the judge. The task of this Court on review is to determine whether the criminal defendant produced that minimum threshold of evidence necessary to establish a prima facie case that would allow a jury to rationally conclude that the evidence supports the application of the legal theory desired. (Citations omitted.)
>
> *Dishman v. State*, 352 Md. 279, 292-93, 300, 721 A.2d 699, 705, 709 (1998) (holding that, because "the evidence allowed

15

the jury to conclude that Petitioner acted with gross negligence and not a specific intent to kill or cause serious bodily injury, the trial court erred by refusing the manslaughter instruction”); *see also Binnie v. State*, 321 Md. 572, 580, 583 A.2d 1037, 1040–41 (1991) (“We first must determine if the evidence adduced at the trial generated a jury issue as to whether [the defendant] acted in the honest belief that he had the right to obtain or exert control over the property as he did.... In our view, [the defendant's] testimony was sufficient to support fairly the issue whether he acted in an honest belief[.]” (quotation marks omitted)); *Smith v. State*, 302 Md. 175, 183, 486 A.2d 196, 200 (1985) (“The instruction should be given in every case where there is sufficient evidence to take the issue to the jury.” (citations and quotation marks omitted)).

*Bazzle*, *supra*, 426 Md. at 550-51. A particular instruction is generated “when a defendant can point to ‘some evidence . . . [that] supports the requested instruction. Some evidence is not strictured by the test of a specific standard. It calls for no more than what it says—‘some,’ as that word is understood in common, everyday usage.’” *Malaska v. State*, 216 Md. App. 492, 517 (2014), *reconsideration denied* (May 7, 2014), *cert. denied*, 439 Md. 696 (August 28, 2014) (quoting *Bazzle*, *supra*, 426 Md. at 551).

In the present case, the record makes clear that the trial court carefully considered whether an instruction on the gross negligence variation of involuntary manslaughter was generated by the evidence. The court explained that “[t]he difficulty [it was] having . . . [was that] in order for an involuntary manslaughter instruction to go, there has to be some evidence that [Jarrett] did something and was grossly negligent doing it, which caused [Christine’s] death . . . Here we don’t have anything except for [a] statement that there was

16

a verbal argument." The trial court ultimately concluded that a gross negligence variation of involuntary manslaughter instruction was not generated by the evidence, ruling as follows:

> [W]hen the evidence is generated, I'm obligated to give the instruction. And there's nothing, nothing here to suggest what, if anything, Mr. Jarrett did to cause the death, specifically the death of Christine Jarrett, as far as being gross negligence or conduct like that.
>
> I mean, the evidence here from the State's perspective is that he suffocated her and they'll argue the inferences to be drawn from the evidence that's actually in as opposed to -- and there's going to be a fine line that we're all going to enjoy visiting tomorrow during closing no doubt about where -- what has been generated as an inference and what is mere and pure speculation.
>
> I mean, by way of example if the Defense gets up and starts arguing that she fell down stairs, that's kind of hard to draw into anything that you can draw an inference from. It's one thing to say, are you convinced beyond a reasonable doubt that she didn't fall down the stairs for example. But if you start speculating that she did, well -- and I'm using that because I don't know of anything that's been said that could possibly be support[ive of] using that speculative way of death, but who knows. I might be wrong about that, too. I'm not making any preliminary rulings.
>
> * * *
>
> But I don't know of any evidence period that would support gross negligence as a form of involuntary manslaughter, and as I said, I'll think about it overnight. And you all can do your research.

During jury instructions, the trial court instructed the jury on involuntary manslaughter but declined to give an instruction on the specific gross negligence variation. The court instructed the jury on involuntary manslaughter as follows:

17

The defendant is charged with the crime of involuntary manslaughter. A person does not have to intend to kill or intend to inflict such serious bodily harm that death would be the likely result when he commits the act that causes the death to be found guilty of involuntary manslaughter. In order to convict the defendant of involuntary manslaughter, the State must prove: (1) the defendant committed an assault upon Christine Jarrett; (2) that the defendant killed Christine Jarrett; and, (3) that the act resulting in the death of Christine Jarrett occurred during the commission of the assault upon Christine Jarrett.

Having carefully reviewed the record in the present case, we conclude that the trial court did not abuse its discretion by declining to instruct the jury on the gross negligence variation of involuntary manslaughter. As the trial court found, there was no evidence presented to suggest that Jarrett was grossly negligent by acting in a manner that created a high risk to, and showed a reckless disregard for, human life. Because there was no evidence which would demonstrate Jarrett acted in a grossly negligent manner, the requested instruction was not generated by the evidence. Accordingly, we hold that the trial court did not err or abuse its discretion by declining to give the gross negligence variation of the involuntary manslaughter instruction.

**III.**

Jarrett's third contention is that the circuit court abused its discretion by propounding a concealment of evidence jury instruction. As discussed *supra*, we review the trial court's decision to provide a concealment of evidence instruction for abuse of discretion. *Stabb*, *supra*, 423 Md. at 465. Jarrett takes issue with the trial court's concealment instruction for two reasons. First, Jarrett asserts that the instruction erroneously implied that Jarrett was

18

guilty of the crimes charged. Second, Jarrett asserts that the concealment instruction was not supported by the evidence.

The trial court propounded the following concealment of evidence instruction:

> You have heard that the defendant concealed and/or destroyed evidence in this case. Concealment or destruction of evidence is not enough by itself to establish guilt, but may be considered as evidence of guilt. Concealment or destruction of evidence may be motivated by a variety of factors, some of which are fully consistent with innocence.

> You must first decide whether the defendant concealed and/or destroyed evidence in this case. If you find that the defendant concealed and/or destroyed evidence in this case, then you must decide whether that conduct shows a consciousness of guilt.

Jarrett contends that, because the trial court's instruction included a reference to the jury having "heard that *the defendant* concealed and/or destroyed evidence," the instruction "was tantamount to a statement of guilt." We are unpersuaded by Jarrett's attempt to place unreasonable emphasis on two words in the first sentence of the trial court's instruction. The instruction, viewed as a whole, was proper. First, we note that the instruction given by the court is a verbatim reading of Maryland Criminal Pattern Jury Instruction 3:26.[3] The pattern

---

[3] In his brief, Jarrett asserts that the trial court's instruction was based on Maryland Criminal Pattern Jury Instruction 3:24. He is mistaken. The trial court's instruction was a verbatim reading of Maryland Criminal Pattern Jury Instruction 3:26, which provides:

> You have heard that the defendant _____ evidence in this case. Concealment or destruction of evidence is not enough by itself to establish guilt, but may be considered as evidence of guilt. Concealment or destruction of evidence may

(continued...)

19

instruction, like the instruction given in this case, provides language instructing jurors that they "have heard that the defendant _____ evidence in this case." We have explained that "[a]lthough the use of a pattern jury instruction does not insulate a conviction against review, it is a factor in our analysis." *Yates v. State*, 202 Md. App. 700, 723 (2011), *aff'd*, 55 A.3d 25 (2012). Indeed, we have repeatedly "recommended that trial judges use the pattern instructions." *Id.* (citing *Minger v. State*, 157 Md. App. 157, 161 n. 1 (2004) ("Appellate courts in Maryland strongly favor the use of pattern jury instructions"); *Green v. State*, 127 Md. App. 758, 771 (1999) (recommending that trial judges give pattern jury instructions)). Furthermore, the trial court's instruction explicitly informed the jury that it "must first decide whether the defendant concealed and/or destroyed evidence." We, therefore, hold that the instruction, viewed as a whole, was proper and did not impermissibly imply that Jarrett was guilty of the crimes charged.

---

[3] (...continued)
> be motivated by a variety of factors, some of which are fully consistent with innocence.

> You must first decide whether the defendant _____ evidence in this case. If you find that the defendant _____ evidence in this case, then you must decide whether that conduct shows a consciousness of guilt.

The trial court filled the blanks in the pattern instruction with the phrase "concealed and/or destroyed."

We now turn to Jarrett's contention that the concealment instruction was not generated by the evidence. As discussed *supra*, a particular instruction is generated by the evidence "when a defendant can point to some evidence" that supports the instruction. *Malaska*, *supra*, 216 Md. App. at 517. Jarrett asserts that there was no evidence presented of post-crime behavior that reflects a consciousness of guilt. We disagree.

Significant evidence was presented at trial upon which a jury could have concluded that Jarrett concealed Christine's body by burying it under the floor of the shed in his backyard. Cindy Fryer, a friend of Christine's, testified that shortly after Christine disappeared, she observed Jarrett build a wooden shed around an older metal shed in the backyard, after which Jarrett "tore the metal shed out." Fryer further testified that within two to three months after Christine's disappearance, she observed empty concrete bags outside of Jarrett's shed. Furthermore, evidence was presented that Jarrett had referred, in an email, to locking Martha in a shed. Jarrett commented that he "might need a bigger shed" because it was "getting crowded in there," and asked whether he "[s]hould put [Martha] beside the one that's already in there." Our review of the record leads us to conclude that there was ample evidence presented upon which a reasonable jury could have determined that Jarrett buried Christine under the floorboards of his shed and encased her remains in concrete.

Jarrett argues that a concealment instruction is only appropriate when the jury can draw four specific inferences which were set forth by the Court of Appeals in *Thompson v. State*, 393 Md. 291, 311-12 (2006). In *Thompson*, the Court of Appeals adopted the

21

approach that a flight instruction should not be given unless the four inferences set forth by the United States Court of Appeals for the Fifth Circuit in *United States v. Myers*, 550 F.2d 1036 (5th Cir. 1977), can reasonably be drawn. The four inferences are:

> (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

*Thompson*, *supra*, 393 Md. at 312 (quoting *Myers*, *supra*, 550 F.2d at 1049).

We note that Jarrett points to no cases applying the factors set forth in *Thompson* to a concealment rather than a flight instruction. Assuming *arguendo* that the *Thompson*/*Myers* factors apply, we hold that the four inferences can be reasonably drawn based upon the evidence. A fact-finder could have reasonably concluded that Jarrett concealed Christine's remains beneath the shed, encased the remains in concrete, and made jokes about doing so in an email many years after Christine's murder. Furthermore, a fact-finder could have inferred that this behavior suggested consciousness of guilt concerning the crime charged, and that the consciousness of guilt implied actual guilt of the crime charged.

Accordingly, we hold that the concealment of evidence instruction did not erroneously imply that Jarrett was guilty of the crimes charged. Further, because the concealment instruction was supported by the evidence presented at trial, the circuit court neither erred nor abused its discretion by propounding the concealment of evidence instruction.

22

Jarrett's final contention is that the circuit court abused its discretion by declining to give a missing evidence instruction.[4]  Jarrett asserts that such an instruction was warranted because the State permitted the release and subsequent cremation of Christine's remains before the defense had the opportunity to seek an independent evaluation.  Jarrett argues that because of the State's actions, he was deprived of the opportunity to have his own experts evaluate the remains for purposes of identification and cause of death.

As discussed *supra*, we review the trial court's decision not to propound the missing evidence instruction applying an abuse of discretion standard.  *Stabb*, *supra*, 423 Md. at 465.  The Court of Appeals has explained that a missing evidence instruction "is designed to draw a jury's attention to a simple, straightforward premise: that 'one does not ordinarily withhold evidence that is beneficial to one's case.'" *Cost v. State*, 417 Md. 360, 370 (2010) (quoting *Anderson v. Litzenberg*, 115 Md. App. 549, 562 (1997)).  A missing evidence "instruction does not require that a jury make an adverse inference in situations involving the spoliation of evidence; rather, it merely permits such an inference." *Id.*

---

[4] The instruction Jarrett requested was:

> If you find that the State destroyed evidence or allowed the destruction of evidence, namely the remains alleged to be those of Christine Jarrett, you may infer that the destroyed evidence was unfavorable to the State's case.  In order to infer that the destroyed evidence was unfavorable to the State, you must find that the State either destroyed the evidence or allowed the destruction of the evidence.

23

Whether to give a missing evidence instruction is a decision within the trial court's broad discretion. *Patterson v. State*, 356 Md. 677, 688 (1999). The Court of Appeals has explained that "regardless of the evidence, a missing evidence instruction generally need not be given; the failure to give such an instruction is neither error nor an abuse of discretion." *Id.* Although a trial court is required to instruct the jury on the applicable law in a case, a trial court is not generally required to instruct the jury as to facts and inferences. *Id*. at 684. The Court of Appeals has explained:

> "The failure to grant an affirmative instruction does not remove the availability of the inference. As a consequence, whatever prejudice may usually come from not giving an advisory instruction is diminished, because the inferential thought process is still available. The prejudice is simply that such an inference is not given preferred instructional attention over any other inferences available from the testimony or absence of testimony. Possibly for that reason, judges hesitate to grant the missing witness instruction; they do not wish to emphasize one legitimate inference over all others which the jurors have been told are solely within their judgment." *Yuen v. State*, 43 Md. App. 109, 114, 403 A.2d 819[, 823] (1979).

*Id.* at 685 (1999) (quoting *Bailey v. State*, 63 Md. App. 594, 611-12 (1985)). Indeed, despite the trial court's decision not to give a missing evidence instruction, the jury was still free to infer that the destroyed evidence would have been detrimental to the State's case.

Our research has unearthed only one case in which the Court of Appeals found that a trial court abused its discretion by failing to give a missing evidence instruction. *See Cost*, *supra*, 417 Md. 360. In *Cost*, a defendant was charged with crimes arising from the stabbing of a fellow inmate in a prison cell. 417 Md. at 363. Before the crime scene could be

24

examined, the cell was cleaned by prison officials and no physical evidence -- such as towels, bedding, and blood-stained clothing -- was preserved. *Id.* at 366-67. The Court of Appeals held that the trial court abused its discretion by failing to give the missing evidence instruction. *Id.* at 382. The Court emphasized that the case was "not typical" and had "unusual facts." *Id.* at 380. The Court further explained that the type of evidence destroyed was "highly relevant evidence in [the State's] custody that it normally would have retained and submitted to forensic examination." *Id.* at 367.

*Cost* is readily distinguishable from the present case. In *Cost*, the crime scene was cleaned rather than preserved. In the present case, the crime scene was preserved, evidence was submitted for testing, and the remains were subject to an autopsy. In *Cost*, the Court emphasized that the destroyed evidence was evidence that normally would have been retained. Here, there is no indication of any regular practice of retaining remains following an autopsy. To the contrary, testimony from Dr. Patricia Aronica-Pollack established that it is the Office of the Medical Examiner's regular practice to release remains to family members after an autopsy is completed. Indeed, there are strong policy reasons to support this practice in order to give closure to the deceased's family and loved ones.[5]

---

[5] We note further that we are not necessarily convinced that Christine's remains constitute evidence that would be subject to a missing evidence instruction. A California state court addressed a similar issue in *People v. Vick*, 90 Cal. Rptr. 336 (Cal. Ct. App. 1970). In *Vick*, a defendant argued that his due process rights were violated when he was unable to conduct his own post mortem examination of the remains because the remains had been released to the family and cremated after the State's autopsy. The *Vick* court observed:

(continued...)

We further note that there was no evidence presented at trial that *the State* destroyed evidence or allowed the destruction of evidence. Rather, the Office of the Medical Examiner released Christine's remains pursuant to its departmental policy. Thereafter, Christine's sons decided to cremate the remains. Furthermore, we note that Jarrett was notified of the impending cremation before it occurred, when Michael asked him to contribute financially to the cremation expenses, and Jarrett acquiesced.

Jarrett further asserts that the cremation of Christine's remains constituted State action because Christine's sons conferred with Investigator DeCarlo prior to cremating Christine's remains. Investigator DeCarlo testified that he did not have authority over the release of the remains; rather, release of remains was at the discretion of the Office of the Medical Examiner. Investigator DeCarlo simply answered the family's inquiry appropriately by telling Michael and Bobby that cremation would not interfere with the investigation.

---

[5] (...continued)
"There is a clear distinction between examination of physical evidence such as handwriting exemplars, fingerprints, written statements, and the body of a human being. The former are susceptible of examination without the likelihood of outrage to the emotional feelings of the living. As reflected in our laws, our society extends more respect to a dead body than to other physical evidence." *Id.* at 240. Accordingly, the *Vick* court held that due process did not require that a coroner retain possession of a body until a defendant requests permission to conduct his own autopsy examination. *Id.* at 242. Although we need not reach a conclusion on this particular issue, we note that it is an open question whether human remains constitute evidence for which a missing evidence instruction could be given when the remains are released by the medical examiner before the defendant requests permission to conduct an independent evaluation of the remains.

26

Under the circumstances, the circuit court acted within its discretion when it declined to propound a missing evidence instruction. Whether to provide such an instruction with respect to a factual inference is a decision for the trial court. We will not second-guess the trial court's decision to decline giving such an instruction. Moreover, Christine's remains were properly released to her family members pursuant to department policy. The State had no affirmative duty to preserve the remains after the autopsy was completed. Accordingly, we hold that the circuit court did not abuse its discretion by declining to give Jarrett's requested instruction.

## V.

In sum, we reject Jarrett's contentions with respect to all four issues raised. We hold that the circuit court did not err by permitting the State to play highly relevant recordings of certain jail calls between Jarrett and his son. We further reject Jarrett's contentions with respect to jury instructions. We hold that the circuit court neither erred nor abused its discretion by declining to propound a jury instruction on the gross negligence variation of involuntary manslaughter when such an instruction was not generated by the evidence. Furthermore, we hold that the circuit court acted within its discretion when it propounded a concealment of evidence jury instruction. Finally, we hold that the circuit court neither erred nor abused its discretion by declining to propound a missing evidence jury instruction.

> **JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**

27