LILJEBERG, J.
*435 Defendant, Troy C. Kelly, appeals his conviction and sentence for second degree murder. For the following reasons, we affirm and remand for correction of the Uniform Commitment Order.
PROCEDURAL HISTORY
On June 19, 2014, a Jefferson Parish Grand Jury returned an indictment charging defendant, Troy C. Kelly, with the second degree murder of two-year-old S.B.,[1] in violation of La. R.S. 14:30.1. Defendant pleaded not guilty at his arraignment on June 20, 2014.
On February 27, 2014, prior to his indictment and arraignment, defendant filed a Motion to Allow Independent Autopsy upon the body of S.B. On February 28, 2014, a commissioner heard oral argument and denied defendant's motion, noting that S.B.'s funeral was the following day, and finding that defendant failed to serve the coroner's office, the funeral home, or the mother of the deceased child with the motion. Thus, the trial court noted that, even if it granted defendant's motion, the court could not stop the burial from moving forward the following day. The trial court further noted that defendant would have the right to apply to have the body exhumed at a later date.
On October 19, 2016, the State filed a notice pursuant to La. C.Cr.P. art. 719, notifying defendant that it intended to introduce the expert opinion testimony of Dr. Neha Mehta in the field of child abuse pediatrics. On October 25, 2016, defendant filed an opposition to the State's notice asserting Dr. Mehta did not possess the requisite expertise and knowledge needed to offer her opinion. On October 26, 2016, the trial court denied defendant's opposition to Dr. Mehta's expert testimony.
Trial commenced before a twelve-person jury on February 14, 2017. On February 16, 2017, the jury returned a verdict of guilty as charged. On February 24, 2017, defendant filed motions for new trial and post-verdict judgment of acquittal, which the trial court denied on March 2, 2017. After defendant waived delays, the trial court sentenced defendant to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. Defendant filed a motion for appeal, which was granted by the trial court on March 7, 2017.
FACTS
On the morning of February 21, 2014, Alencia Batiste found her two-year-old son, S.B., unresponsive in his bed. Defendant, Alencia's boyfriend, was not in the apartment at the time. Upon discovering S.B., Alencia carried him into the kitchen and then called defendant to ask him to return home. Alencia attempted CPR on S.B. before running to get help from her neighbor, Audrey Wallace, and calling 9-1-1. Ms. Wallace also attempted to perform CPR on S.B. to no avail.[2]
Jefferson Parish paramedic, Hanna Ravain, recalled entering the Batiste apartment at 7:25 a.m. to find Ms. Wallace performing CPR on S.B. with Alencia in the room. She recalled that Alencia was emotionless and provided little information regarding the circumstances of her son's *436 condition. Ms. Ravain did not attempt CPR on the child as it was obvious he was deceased because she saw evidence of rigor and he was cold to the touch. She explained to the jury that rigor, the stiffening of the body, typically presents itself a couple of hours after death. Ms. Ravain further observed bruising to S.B.'s left arm, right shoulder, lower abdomen, chest and face, which in her experience was not consistent with CPR attempts. While outside and before leaving the scene, Ms. Ravain overheard Alencia's mother, Claudette Batiste, say to Alencia "[y]ou f**king killed him; I told you; I knew this was going to happen; you did this."[3]
Homicide Detective Jean Lincoln of the Jefferson Parish Sheriff's Office testified regarding his prior experience in the Personal Violence Division including his specialized training in the area of child abuse in connection with homicides. He explained that when he arrived on the scene, he immediately noticed bruising in the pattern of fingertip impressions present on S.B.'s chest.[4]
Dr. Dana Troxclair, expert in the field of forensic pathology, performed the autopsy on S.B. She testified that the child presented with multiple contusions (bruises) to his body, including his scalp, chin, chest, arm, abdomen, and a hematoma (a collection of blood) underneath his scalp. She noted that rigor was present in the child's face and upper extremities, which typically begins to form within an hour or two after death. Dr. Troxclair explained that the bruises present on the child's chest and back were not the result of any lifesaving efforts such as CPR, but rather were possibly fingerprint marks caused from holding the child. She further opined that the bruises on the child were "fresh bruises" as indicated by their purple/red color, establishing they were likely sustained within 24 hours prior to his death. She further explained that the head injuries suffered by S.B. were not typical of self-inflicted wounds normally found on a child.
Upon conducting the internal examination of S.B., Dr. Troxclair observed blood in his abdomen and noted he sustained fractures to nine of his ribs, causing a lacerated lung. She also discovered S.B.'s liver and spleen sustained lacerations caused by blunt force trauma to his abdomen, along with hemorrhage to his diaphragm also caused by blunt force trauma.[5] Dr. Troxclair further explained the blood found in S.B.'s abdomen was the result of his abdomen being forcefully pushed into his backbone. S.B.'s heart and kidneys were also pale in color due to the amount of blood loss, indicating that S.B. "bled out," having lost a third of his total blood volume. Dr. Troxclair opined that a child could only live a couple of hours at most with the injuries S.B. sustained. Dr. Troxclair also opined that the injuries S.B. sustained did not occur from simply pulling the child out of the bathtub by his arm, but could have been caused by pulling the child from the bathtub and throwing him against a toilet. S.B.'s death was classified as a homicide with death caused by multiple blunt force injuries.
*437 S.B.'s mother, Alencia, testified that in addition to S.B., she has four other young children. On the night of February 20, 2014, she ran the water for her children's bath before leaving to go to the Dollar General Store,[6] leaving defendant with her children. When she returned she could not recall whether the boys were in bed, however, nothing seemed out of the ordinary. She did recall S.B. was a little more "whiney" that night so she gave him a dose of Children's Tylenol. She testified that S.B. shared a room with his two older brothers, who were six and three years old at that time, and they all slept on the bottom bunk of a bunk bed. They would often jump from the top bunk down to the bottom; but, she was not aware of them engaging in this behavior on the evening at issue.[7] Alencia noted that after the children were in bed she heard them playing in their room. She recalled going into the room and seeing S.B. sitting up in bed "whining."
Alencia went to the police station along with defendant for questioning after finding S.B. dead. She explained that defendant moved in with her approximately one month prior to her son's death and that her mother did not approve of him. She further testified that she never disciplined her children, which was a point of contention between herself and defendant. Alencia recalled an instance when another one of her sons spit on defendant, who then quickly grabbed the child and tapped him on the hand. Alencia told defendant to never put his hands on her children again. Alencia testified that she initially provided inconsistent answers to the police regarding what happened on the evening prior to S.B.'s death, including whether she or defendant bathed and/or dressed the children that night, because she was in shock over the death of her son.
Deputy Gabriel Faucetta of the Jefferson Parish Sheriff's Office interviewed defendant while the autopsy of S.B. was taking place. During the interview, defendant told Deputy Faucetta that on February 20, 2014, he arrived home from work around 4:00 p.m. The children were home with Alencia, they cooked dinner and then ate together as a family around 6:00 or 7:00 p.m. Defendant initially told Deputy Faucetta that around 8:00 p.m., the three boys, including S.B., bathed and then played in their room while he and Alencia watched television in the living room. He explained that around 8:30 p.m., they told the boys to go to bed.
When asked about the bruises on S.B.'s chest, defendant stated they were likely caused by falling out of the bed or the shower, explaining that S.B. and his brothers often engaged in horseplay with each other. Defendant denied disciplining the children. When told S.B. had numerous bruises, defendant stated someone must have punched or poked S.B. Defendant then recalled that two days prior to S.B.'s death, Alencia told him the boys were jumping off the bunk bed.[8] Defendant also stated that Alencia did not hurt S.B., explaining that Alencia does not hit her children.
*438 After Detective Faucetta advised defendant that the coroner discovered S.B. had multiple broken ribs, defendant again mentioned the boys were "horse playing" in their room before going to bed around 10:00 p.m. Detective Faucetta then told defendant that S.B.'s injuries were consistent with compressions. At first, defendant denied touching S.B., but then admitted he sometimes grabbed the boys by their arms.
Later in the interview, defendant admitted that in the past he picked S.B. up by the torso, underneath his arms, and sternly asked him about his repeated bathroom accidents. He explained S.B. used to wet himself almost every day and he picked him up multiple times to bring him to the toilet. He expressed his frustration towards Alencia's "potty training" efforts, stating that he felt S.B. should not still be wearing diapers. Detective Faucetta discussed in more detail the injuries S.B. sustained, to which defendant stated that if he did hurt S.B., he did not intend to hurt him. He then explained that the night before his death, S.B. defecated in the bathtub. He stated that he made S.B. remove the waste from the bathtub with his hands and throw it in the toilet before Alencia returned home from the store, and then finished bathing and dressing the boys for bed.
Detective Faucetta explained the importance of finding out what happened to S.B., at which time defendant said it was probably from him holding S.B. Then, when asked by the detective if he was rough with S.B., defendant admitted to squeezing S.B. He further revealed that he snatched S.B. from the bathtub by the arm when he defecated in the tub and tossed him into the toilet to get him out of his way. Defendant stated he got angry because the boys were playing in the feces in the bathtub. He then demonstrated the way in which he picked up S.B., placing both hands underneath S.B.'s armpits and around his chest area. He admitted he may have grabbed S.B. too hard when he pulled him out of the tub and S.B. hit the toilet on his side ribs. Defendant explained that S.B. made a whining sound like he was hurt and agreed his actions hurt S.B., even though he did not intend to hurt him when he threw him against the toilet. Defendant also admitted Alencia was at the store when S.B. defecated in the bathtub.
When asked about Alencia's mother, Claudette, who often watched the children, defendant recalled arguing with Claudette because she did not chastise her grandchildren when two of them wet the bed. He also recalled an incident when he and Alencia first started dating when he "popped" S.B. because of a bathroom accident. Alencia told him she would not let him hit her kids. Defendant stated kids should be "whopped" if they are out of line.
Later in the interview, defendant admitted his actions were more aggressive than he originally explained, further admitting that after he got home from work that afternoon he also "grabbed" S.B. because he wet himself. Defendant also admitted he did not tell Alencia about the incident in the bathtub because she would be mad if she knew he grabbed S.B. from the tub and threw him against the toilet. Defendant then stated that looking back he should have told Alencia what occurred because she could have called the ambulance.
The next morning when he went to get S.B. out of bed and saw he was dead, defendant was worried about what happened the night before. Defendant claimed it was a mistake and he did not intend to hurt S.B. When asked by the detective how S.B. died, he stated it was from throwing S.B. into the toilet. He then *439 agreed that he should go to jail for what he did to S.B., acknowledging that his actions killed S.B., but not intentionally. At one point during the interview, Detective Faucetta left room, and defendant said "Forgive me, Troy. I'm sorry, Jesus, I'm sorry momma, I didn't mean -I didn't mean to, I'm not like this, what am I doing with my life."
Alencia's mother, Claudette Batiste, testified that she and her boyfriend, Simon Hicks, watched S.B. and his brother the day before he was killed. She explained that when she returned S.B. to Alencia's apartment, he had no marks on his body. She further recalled that S.B. had a cold, but was not whining or in pain. The next morning, Claudette called Alencia to tell her to get S.B. ready for an outing at the zoo and about ten minutes later she received a call back from her daughter who was screaming that S.B. was unresponsive. When Claudette arrived at the apartment a crowd was gathered outside. She testified that she was angry and upset and began yelling at her daughter asking "what the hell happened?"
Simon Hicks recalled that while watching S.B. the day before his death, he observed S.B. take one of the dolls from the Barbie dollhouse and hit the doll while holding it on the dollhouse toilet saying several times, "pee, pee, pee." Mr. Hicks was confused by this behavior, finding it to be inappropriate. Mr. Hicks testified that S.B. was potty training at the time he was killed. He further recalled that when Claudette informed S.B. that she was going to bring him back home, S.B. cried and told them he did not want to leave. Mr. Hicks stated that he did not see any injuries or bruising on S.B. that day. Mr. Hicks also testified regarding a prior instance when S.B. cringed as defendant passed by S.B. Mr. Hicks told Claudette that S.B. acted as if he was scared when defendant would come near him.
Dr. Neha Mehta, an expert in the field of child abuse pediatrics, testified that she reviewed a copy of the autopsy report and some of the photographs taken of the deceased child. During her review she noted S.B. had a few dozen bruises on his chest and a couple dozen bruises on his back. She also observed bruising to his arm, abdomen and face. She explained that the bruises on S.B.'s chest were similar in appearance, and possibly represented the molds of fingertips from a hand that compressed downward onto the tissue of the chest. She further explained the fingerprint bruises on his chest were not likely caused by another child since children do not possess the grip strength required to leave the type of bruising sustained by S.B. She explained the bruises were consistent with a grown person's hands wrapped around S.B.'s chest with their fingers on his back "very forcefully crushing the chest," causing the ribs to break. Dr. Mehta opined that the lacerations to S.B.'s spleen and liver would require extreme force such as being rapidly punched in the stomach or stomped on very hard by a full-size person, which can push the organs up against the spine. She concluded that the injuries and bruising on S.B.'s body were not consistent with an accidental fall, jumping off of a bed, or engaging in horseplay with other children, but rather with child abuse given the multiple impact sites at multiple locations.
DISCUSSION
In his third assignment of error, defendant challenges the sufficiency of the evidence used to convict him of second degree murder.[9] He claims the State failed *440 to prove the elements of second degree murder, including cruelty to a juvenile, beyond a reasonable doubt, or that he was the perpetrator of the alleged crime. Alternatively, he argues the State's evidence, consisting solely of his statement, proved only the lesser offense of manslaughter in that the incident happened in the heat of passion.
The appropriate standard of review for determining the sufficiency of the evidence was established in Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). According to Jackson , the standard is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id. Under the Jackson standard, a review of a criminal conviction record for sufficiency of evidence does not require the court to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt. State v. Flores , 10-651 (La. App. 5 Cir. 5/24/11), 66 So.3d 1118, 1122. It is not the function of the appellate court to assess credibility or re-weigh the evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442, 443. The trier of fact shall evaluate credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. State v. Bradley , 03-384 (La. App. 5 Cir. 9/16/03), 858 So.2d 80, 84, writ denied , 03-2745 (La. 2/13/04), 867 So.2d 688.
Defendant was found guilty as charged of second degree murder, in violation of La. R.S. 14:30.1. At trial, the State proceeded under two theories of second degree murder, specific intent and felony murder, seeking to prove defendant committed the murder of S.B. with either the specific intent to kill or inflict great bodily harm and/or while engaged in the perpetration of cruelty to a juvenile.[10] A jury is not constitutionally required to agree on a single theory to convict a defendant where it is instructed as to alternative theories. State v. Seals , 09-1089 (La. App. 5 Cir. 12/29/11), 83 So.3d 285, 346, writ denied , 12-293 (La. 10/26/12), 99 So.3d 53, cert. denied , 569 U.S. 1031, 133 S.Ct. 2796, 186 L.Ed.2d 863 (2013).
Second degree murder is defined as the killing of a human being: (1) when the offender has specific intent to kill or inflict great bodily harm, or (2) when the offender is engaged in the perpetration or attempted perpetration of ... cruelty to juveniles ... even though he has no intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A)(1) and (A)(2). Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed *441 criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Whether a defendant possessed the requisite intent in a criminal case is a question for the trier of fact, and a review of the correctness of this determination is guided by the Jackson standard. State v. Spears , 05-964 (La. 4/4/06), 929 So.2d 1219, 1224. Specific intent may be inferred from the circumstances and from the defendant's actions, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim's injuries. Id.
The felony murder prong of La. R.S. 14:30.1(A)(2) does not require proof of specific intent because the underlying felony supplies the culpable mental state. State v. Small , 11-2796 (La. 10/16/12), 100 So.3d 797, 805. The underlying felony allegedly committed by defendant was cruelty to a juvenile, which is defined in La. R.S. 14:93(A)(1) as the "intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child."
Thus, in order for the State to prove defendant guilty of second degree murder while in engaged in the perpetration of cruelty to a juvenile, it had to establish either: (1) that defendant intentionally mistreated or neglected S.B.; or (2) that defendant was criminally negligent in his mistreatment or neglect of S.B., which caused unjustifiable pain or suffering to S.B. The term "intentional" within the meaning of this statute, requires general criminal intent to cause a child unjustifiable pain and suffering. State v. Victor , 15-339 (La. App. 5 Cir. 5/26/16), 195 So.3d 128, 151. Mistreatment, as used in this statute, means "abuse." Id. Moreover, to be criminally negligent in his mistreatment or neglect of the child, the defendant must have such disregard for the interest of the child that his conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances. Id. ; see also La. R.S. 14:12.
Encompassed within proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. State v. Ray , 12-684 (La. App. 5 Cir. 4/10/13), 115 So.3d 17, 20, writ denied , 13-1115 (La. 10/25/13), 124 So.3d 1096. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. Id. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier of fact, is sufficient to support a requisite factual finding. State v. Caffrey , 08-717 (La. App. 5 Cir. 5/12/09), 15 So.3d 198, 203, writ denied , 09-1305 (La. 2/5/10), 27 So.3d 297.
In the present case, defendant argues the State failed to prove either specific intent murder or murder while engaged in the perpetration of cruelty to a juvenile beyond a reasonable doubt, and further failed to prove his identity as the perpetrator. Based on the evidence presented at trial, we find defendant's contentions lack merit.
Alencia Batiste woke up on the morning of February 21, 2014, to find her two-year-old son, S.B., dead in his bed. The evidence at trial established that the night before, unbeknownst to Alencia, defendant inflicted fatal injuries upon her child while she was not at home. When brought to the police station for questioning, defendant at first denied injuring S.B. However, as the interview progressed, defendant admitted that on the evening of February 20, 2014, when S.B. defecated in the bathtub, he *442 became angry, snatched S.B. from the tub, wrapped his hands around his chest, and threw S.B. against the toilet. He further admitted that based on the sounds S.B. made afterwards, he was likely injured.
Dr. Neha Mehta, expert in the field of child abuse pediatrics, confirmed that the bruises on S.B.'s chest represented the molds of fingertips from a hand that compressed downward, "very forcefully crushing the chest." Dr. Mehta ruled out the possibility that S.B.'s injuries were the result of horseplay with other children or from an accidental fall off of a bunk bed, but rather, were the result of child abuse given the multiple impact sites at multiple locations on the child's body.
Additionally, while defendant asserts the State failed to prove his identity as the perpetrator, not only did defendant admit to causing the injuries that killed S.B., throughout the interview defendant repeatedly stated Alencia was not home at the time of the bathroom incident nor was she apprised of what had occurred once she arrived home. Additionally, while Alencia's mother, Claudette, and her boyfriend, Simon, also watched S.B. earlier that same day, they each testified they never hit the grandchildren and that S.B. had no bruises or injuries when he left their care. Simon further recalled a time prior to S.B.'s death when he observed S.B. engaged in pretend play where he chastised a doll for not using the bathroom. Simon also noted that S.B. acted as if he was scared when defendant would come near him and cried when he was brought back home. The evidence further established that defendant argued with both Alencia and Claudette regarding physical discipline of the children.
The evidence at trial further established the presence of pattern bruising on S.B. Expert forensic pathologist, Dr. Troxclair, performed the autopsy on S.B. and recounted the severity of the injuries suffered by the child including extensive widespread contusions to his scalp, chin, chest, arms and abdomen, the hematoma underneath his scalp, nine fractured ribs, hemorrhage to his diaphragm, and lacerated lung, spleen and liver. Additionally, the pale color of S.B.'s heart and kidneys indicated that he had "bled out," having lost a third of his total blood volume. The early onset of rigor and the fact that the contusions present on S.B. were "fresh" as indicated by their color, established that the fatal injuries were inflicted within twenty-four hours of his death. Dr. Troxclair opined that the multiple blunt force injuries suffered by S.B. were similar to a high-speed automobile accident and not typical of self-inflicted wounds normally found on a child. She further opined that S.B.'s injuries could have been caused by pulling the child from the bathtub and throwing him against a toilet.
Evidence of the painful nature of the injuries suffered by S.B. and the fact that they were not inflicted accidentally, but instead were intentionally inflicted, negate any claim of accidental injury and prove the elements of second degree murder, including cruelty to a juvenile. There was no conflicting evidence presented at trial regarding the cause of S.B.'s death. Additionally, defendant's hypotheses of innocence, i.e. that the injuries were the result of horseplay with S.B.'s siblings and/or from jumping off of the bunk bed, were negated by the expert witnesses in this case as well as by defendant's own admissions. Moreover, the jury chose to reject defendant's theory that anyone other than himself caused S.B.'s deadly injuries. It is the fact-finder who weighs the respective credibility of the witnesses, and this Court will not second-guess those determinations. Smith , 661 So.2d at 443.
*443 Accordingly, when viewed in the light most favorable to the State, the evidence is sufficient to convince a rational trier of fact, beyond a reasonable doubt, that defendant inflicted lethal injuries upon S.B. having both the specific intent to kill or inflict great bodily harm, and also while engaging in the perpetration of the crime of cruelty to a juvenile, S.B., thus, committing second degree murder.[11]
In his first assignment of error, defendant argues the trial court denied his constitutional right to present a defense when it denied his motion for an independent autopsy.
On February 27, 2014, prior to his indictment and arraignment, defendant filed a Motion to Allow Independent Autopsy upon the body of S.B. On February 28, 2014, a hearing on defendant's motion was held. At the hearing, defense counsel acknowledged the unique nature of the request and advised the trial court that S.B.'s funeral was scheduled for the following day. Counsel argued that in the interest of providing defendant with an adequate defense, it was necessary to request the opportunity to perform an independent autopsy on the child before his burial. Defense counsel argued that defendant did not cause S.B.'s death and that an independent autopsy was essential to establish the nature and timing of S.B.'s injuries. He maintained his motion should be granted because defendant was entitled to examination of all scientific evidence under the rules of discovery.
The State responded that it was not in possession of the child's body and that defendant did not serve the coroner's office or the funeral home with defendant's motion. It further submitted that defendant did not have the right to have an autopsy on a victim who is not his biological child and that defendant would have the opportunity to review the autopsy notes, slides, and films and failed to provide a basis why the autopsy was insufficient. Citing to a California appellate case, People v. Vick , (1970) 11 Cal.App.3d 1058, 90 Cal.Rptr. 236,[12] the State argued the *444 rights of the family members to bury the child are tantamount and defendant failed to present any law establishing a right to access the body of a victim after an autopsy was performed under these circumstances.
After hearing argument, the commissioner denied defendant's motion, finding that defendant failed to serve the coroner's office, the funeral home, or the mother of the deceased child. Thus, the commissioner noted that, even if it granted defendant's motion, the court could not stop the burial from moving forward the following day. The commissioner further noted that defendant would have the right to apply to have the body exhumed at a later date.
On appeal, defendant argues an independent autopsy was crucial to challenging the coroner and other experts' testimony about the time and cause of S.B.'s death, which he claims were integral to the State's circumstantial evidence against him. He alleges that because the evidence established S.B. was in the care of three other adults and exposed to "bigger children" during the 48-hour period when S.B. allegedly sustained injuries, the denial of an independent autopsy prevented him from developing other reasonable hypotheses of innocence.
Both the Sixth Amendment of the United States Constitution and Louisiana Constitution, Article I, Section 16, provide that a criminal defendant has the right to present a defense. However, the constitutional right to present a defense does not translate to a right to conduct unfettered discovery and testing of evidence.[13] Defendants do not have a general constitutional right to unlimited discovery in a criminal case. State v. Ferguson , 15-0427 (La. App. 1 Cir. 9/18/15), 181 So.3d 120, 142 ; State v. Johnson , 33,174 (La. App. 2 Cir. 5/10/00), 759 So.2d 1052, 1062writ denied , 00-1949 (La. 9/21/01), 797 So.2d 60.
It is well-established that trial courts have vast discretion in the regulation of pre-trial discovery. State v. Frisard , 96-368 (La. App. 5 Cir. 4/29/97), 694 So.2d 1032. Decisions made by the trial court in these matters will not be overturned absent a clear abuse of that discretion. Id.
In denying a similar request for an independent autopsy, a California court, in Vick, supra, discussed the distinction between a request to conduct an examination of a human body and other forms of physical evidence as follows:
There is a clear distinction between examination of physical evidence such as handwriting exemplars, fingerprints, written statements, and the body of a human being. The former are susceptible of examination without the likelihood of outrage to the emotional feelings of the living. As reflected in our laws, our society extends more respect to a dead body than to other physical evidence.
*445 While the state has no interest in the denial of the type of discovery sought herein, further outrage to the family of the victim may be prevented by such denial.
90 Cal.Rptr. at 240 (Internal citations omitted.)
In Commonwealth v. Woodward , 427 Mass. 659, 694 N.E.2d 1277, 1290 (1998), the Supreme Judicial Court of Massachusetts determined a defendant did not have a statutory right to an independent autopsy:
While we do not interpret this statute to prohibit in all circumstances a request such as the defendant's, the statute's silence on this issue certainly does not support any statutorily based right of a defendant to have access to a victim's body for an independent autopsy. Rather, the statute's explicit acknowledgment of a legal right of others to the body after the medical examiner completes his duties indicates that whatever due process right a defendant may claim must be balanced against statutory, as well as common-law and constitutional, rights to the body of a victim's immediate family.
Upon completion of the autopsy, La. R.S. 13:5715(A)(1) states a coroner "shall" release the body to family or friends for burial. The facts presented to the commissioner during the February 27, 2014 hearing indicate the coroner completed the autopsy and released the body to the family for burial, which was planned for the following day. Therefore, pursuant to La. C.Cr.P. art. 718, the State no longer had "possession, custody or control" of the body. Further, defendant fails to point to any authority requiring the State to regain possession of the body for purposes of allowing defendant to complete a second autopsy.
More significantly, the denial of defendant's motion for an independent autopsy did not preclude his right to present a defense as a second autopsy was not the only means by which defendant could prove his defense or offer alternative hypotheses of innocence. The State provided defendant with the autopsy report, photographs, medical narrative, results analysis report, a copy of Ochsner Medical Center's Pathology and Laboratory medicine results, as well as the East Jefferson General Hospital medical records generated from the date of S.B.'s death. From this evidence, defendant had ample opportunity to examine or cross-examine the coroner on his findings and to retain his own independent expert to examine the materials and offer testimony in support of his defense. On July 21, 2016, defendant obtained a continuance of the trial date to allow time for a pediatric radiologist to review x-rays taken during the autopsy. However, at trial, defendant did not attempt to challenge the autopsy performed by the coroner or establish that a second autopsy would have supplied additional evidence or defenses. Defendant also did not move to have the body exhumed after burial as suggested by the trial court upon denial of his motion.
Accordingly, we find defendant did not establish his right to put on a defense was adversely affected by the absence of a second independent autopsy. See People v. Roehler , (1985) 167 Cal.App.3d 353, 382-83, 213 Cal.Rptr. 353 (finding defendant failed to establish a denial of due process claim because he failed to establish the potential value an independent examination of the victims' bodies would have on preparing a defense.) We further find the trial court did not abuse its vast discretion when it denied defendant's motion for an independent autopsy requested the day prior to the child's burial.
*446 In his second assignment of error, defendant argues the trial court erred in allowing Dr. Mehta, an expert in the field of child abuse pediatrics, to testify as to the ultimate issue in this case, i.e. that child abuse occurred, in violation of La. C.E. art. 704. He claims the testimony of Dr. Mehta invaded the province of the jury and prejudiced them from fairly considering the evidence being offered by the State and the several reasonable hypotheses of his innocence. Defendant concludes that the admission of Dr. Mehta's testimony was not harmless as there was little other evidence for the jury to consider, and thus, the only possible basis for his conviction was Dr. Mehta's opinion testimony.
The State argues defendant's claim that Dr. Mehta "usurped" the jury's function has not been preserved for review, and in any event, Dr. Mehta's testimony shed medical light on a subject outside the realm of common understanding and was therefore properly admitted.
Prior to trial, the State notified defendant that it intended to introduce Dr. Mehta as an expert in the field of child abuse pediatrics to testify at trial regarding her opinions regarding the fact that the abdominal injury sustained by S.B. was the ultimate cause of death; the behavior of a child before and/or after such injury was inflicted but prior to death; the evidence of abuse based on multiple rib fractures, bruising, and head trauma suffered by S.B., which would not have been caused from CPR or other minor children in the home; and the types of trauma that would cause injuries similar to those suffered by S.B. Defendant filed an opposition to the State's notice, asserting that Dr. Mehta did not have a background or specialized knowledge in the area of pediatric forensic pathology, and that the areas on which Dr. Mehta would testify were outside her expertise and knowledge, pursuant to La. C.E. art. 702.
On October 26, 2016, a hearing was held after which the trial court denied defendant's opposition to preclude Dr. Mehta's expert opinion testimony. At the hearing, defendant argued Dr. Mehta lacked the expertise under La. C.E. art. 702 to testify as to the opinions proffered by the State in its notice. Dr. Mehta testified at the hearing regarding her professional background. She received her medical degree from the Medical College of Georgia, and participated in a three-year pediatric training program at the University of Kentucky where she subsequently worked for an additional year as the chief resident in pediatrics. She then completed a one-year child abuse pediatrics fellowship program at Children's Hospital of Cincinnati, where she stayed for two years as a faculty member working exclusively on cases of suspected child physical and sexual abuse. Dr. Mehta was subsequently recruited to serve as the director of the child abuse program at Sunrise Children's Hospital in Las Vegas, where she remained for approximately nine and a half years before being recruited to come to New Orleans to serve as the director of Children's Hospital's child abuse evaluation program where she served for the past four years.
Dr. Mehta further testified regarding her experience in the diagnoses of child abuse in both living and deceased children. She admitted that while she is not a pathologist, she is trained in identifying the types of injuries seen in cases of child abuse. She explained that she studied skin injury patterns, including bruises, bites, and burns, the muscular skeletal system in terms of the causes of bone fractures, abusive head trauma, abusive abdominal trauma, and received training in identifying the types of injuries one would expect to *447 see in children who have suffered from accidental falls versus those inflicted by abuse. Dr. Mehta indicated she routinely reviews information related to radiology, orthopedics, neurosurgery, trauma surgery, and on some occasions, pathology, as part of her evaluations. Dr. Mehta testified that she was previously accepted as an expert witness in multiple jurisdictions, including Louisiana, Nevada, Ohio, and Indiana, and has never been denied qualification as an expert.
During the traversal of Dr. Mehta's qualifications, she testified that while she has been present for many autopsies, she does not determine cause of death. At the conclusion of the hearing, defense counsel stated he did not object to Dr. Mehta being qualified as an expert in child abuse pediatrics but objected to the nature of the opinion testimony that the State sought to elicit from her, which he alleged to be outside the scope of her expertise. Defendant further specified that Dr. Mehta's opinions based on review of the autopsy report would be improper as she is not experienced in identification of child abuse injuries post-mortem.
In permitting Dr. Mehta to testify regarding her opinions as set forth in the State's notice, the trial court found her qualified to testify regarding injuries consistent with child abuse and noted defendant was free to cross-examine Dr. Mehta regarding his concerns as to her expertise. At trial, defendant stipulated to Dr. Mehta's expertise in the field of child abuse pediatrics and lodged no objections during her testimony.
For the first time on appeal, defendant presents a new argument as to the opinion testimony of Dr. Mehta. During pre-trial proceedings, defendant argued Dr. Mehta's opinion testimony should not be permitted on the basis that she lacked the expertise to reach the opinions drawn under La. C.E. art. 702. Now, on appeal, defendant argues the trial court erred in permitting Dr. Mehta to offer her opinion as to the ultimate issue of guilt in violation of La. C.E. art. 704.
A new basis for objection cannot be raised for the first time on appeal. See La. C.Cr.P. art. 841 ; State v. Necaise , 466 So.2d 660, 667 (La. App. 5th Cir. 1985) ; State v. Hill , 93-405 (La. App. 5 Cir. 3/29/94), 636 So.2d 999, 1002, writ denied , 94-3144 (La. 9/1/95), 658 So.2d 1259. Thus, because defendant now asserts a new ground for his objection as to Dr. Mehta's testimony, i.e. that her expert opinion was used to usurp the role of the jury, we find defendant is prevented from raising this issue on appeal.
Moreover, at trial, defendant did not object during Dr. Mehta's testimony in which he claims that she allegedly provided "conclusory testimony" on the element of cruelty to a juvenile which "prevented the jury from fairly considering whether child abuse occurred, who inflicted it, and whether there may have been different people causing different injuries to [S.B.] at different times." To preserve the right to appellate review of an alleged trial court error, a party must state a contemporaneous objection with the occurrence of the alleged error as well as the grounds for the objection. State v. Torregano , 03-1335 (La. App. 5 Cir. 5/11/04), 875 So.2d 842, 846. The purpose behind the contemporaneous objection rule is to put the trial court on notice of an alleged irregularity so that it may cure the problem. It is also intended to prevent a defendant from gambling for a favorable verdict and then resorting to appeal on errors that might have easily been corrected by an objection. Id. Defendant's lack of objections during Dr. Mehta's testimony failed to put the trial court on notice of the alleged error, and thus, failed to properly *448 preserve this argument for appellate review.
ERROR PATENT DISCUSSION
The record was reviewed for errors patent, according to La. C.Cr.P. art. 920 ; State v. Oliveaux , 312 So.2d 337 (La. 1975) ; and State v. Weiland , 556 So.2d 175 (La. App. 5 Cir. 1990). Our review reveals one error in the Uniform Commitment Order ("UCO"), which must be corrected by the trial court.
A discrepancy exists between the UCO and the record in this case. The UCO provides that the offense was committed on February 20, 2014, when the record confirms the offense was committed on or between February 20, 2014 and February 21, 2014. Accordingly, we remand the matter for correction of the UCO to accurately reflect the date of the offense and also direct the Clerk of Court for the 24th Judicial District Court to transmit the original of the corrected UCO to the appropriate authorities in accordance with La. C.Cr.P. art. 892(B)(2) and the Department of Corrections' legal department.
DECREE
For the foregoing reasons, this Court affirms defendant's conviction and sentence. We remand this matter to correct the Uniform Commitment Order in accordance with the instructions set forth in the opinion.
CONVICTION AND SENTENCE AFFIRMED; REMANDED FOR CORRECTION OF THE UCO

The victim's initials are used under the authority of La. R.S. 46:1842(3)(a) and 46:1844(W)(3), which allow this Court to identify a victim of a homicide who is also a minor by using his or her initials.

Ms. Wallace noted that she was unable to open S.B.'s mouth because his teeth were tightly clenched together.

Troy Smith, defendant's father, recalled receiving a phone call that morning from defendant who told him "something was wrong" with S.B. When he arrived at the Batiste apartment, he observed Alencia's mother hit Alencia and yell "what happened, what did -what y'all did to the baby."

Detective Lincoln testified that he examined the other children in the household and did not observe any injuries on them.

Dr. Troxclair testified that the hemorrhage to S.B.'s diaphragm was similar to injuries sustained in an "automobile accident where there's a lot of force."

A receipt from the Dollar General Store with a time and date stamp of 7:41 p.m. on February 20, 2014, was introduced into evidence.

Alencia testified on cross-examination that during her statement, she told the police that the day before S.B. died, the children were jumping on the bed.

Deputy Faucetta testified that he informed the coroner of the fact that there was a set of bunk beds in S.B.'s bedroom and was told that jumping from them would not have caused the magnitude of injuries suffered by the child.

When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, such as the erroneous admission of evidence, the reviewing court should first determine the sufficiency of the evidence by considering all of the evidence, including evidence the trial court may have erroneously admitted. State v. Hearold , 603 So.2d 731, 734 (La. 1992) ; State v. Mayeux , 94-105 (La. App. 5 Cir. 6/28/94), 639 So.2d 828, 834. If the appellate court determines the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. However, if the appellate court finds the totality of the evidence was sufficient to support the defendant's conviction, it must then determine whether the trial court erred in admitting the questioned evidence and, if so, whether the trial court's error requires a reversal of the conviction or was harmless. State v. Alexis , 98-1145 (La. App. 5 Cir. 6/1/99), 738 So.2d 57, 64, writ denied , 99-1937 (La. 10/13/00), 770 So.2d 339. Therefore, defendant's assigned error concerning the sufficiency of the evidence will be addressed first.

The jury charges reflect that the trial court instructed the jury as to the law for both specific intent murder and murder while the offender is engaged in the perpetration of cruelty to juveniles.

See Victor , supra , where this Court found the evidence was sufficient to sustain the defendant's conviction for second degree murder while engaged in the perpetration of the crime of cruelty to a juvenile because the defendant dropped off the unresponsive child at the emergency room, a doctor opined that the child had likely been dead for "a while," bruises were also observed all over the child's body, the defendant stated that "we had to discipline him" because he was stealing, and witnesses testified that the defendant beat the child with a belt over the span of two days; State v. Booker , 02-1269 (La. App. 1 Cir. 2/14/03), 839 So.2d 455, writ denied , 03-1145 (La. 10/31/03), 857 So.2d 476, where the defendant's second degree murder conviction was upheld where the immediate cause of the child's death was hypothermia from being left in a cold room. In addition, the child's weakened physical condition, which was due to malnourishment and Battered Child Syndrome, hastened her death, and medical testimony supported the conclusion that the child was beaten severely, possibly rendered unconscious, tied up, and left in the unheated room; see also the following cases in which a second degree murder conviction has been upheld based on cruelty to a juvenile, where the defendant committed direct acts of abuse. State v. Tensley , 41,726 (La. App. 2 Cir. 4/4/07), 955 So.2d 227, writ denied , 07-1185 (La. 12/7/07), 969 So.2d 629 (child beaten to death); State v. Miller , 06-595 (La. App. 3 Cir. 9/27/06), 940 So.2d 864, writ denied , 06-2577 (La. 5/11/07), 955 So.2d 1278 (shaken baby syndrome); State v. Richthofen , 01-500 (La. App. 5 Cir. 11/27/01), 803 So.2d 171, writ denied , 02-206 (La. 1/31/03), 836 So.2d 57 (shaken baby syndrome).

In Vick , supra , the defendant argued on appeal that his right to examine the remains of the victim in a homicide case was similar to his right to run independent ballistic tests, fingerprints, or handwriting analyses. The appellate court noted a clear distinction between examination of physical evidence such as fingerprints, handwriting exemplars, and the body of a human being. It reasoned that the former are susceptible to examination without the likelihood of outrage to the emotional feelings of the living. The appellate court concluded that a trial court has the discretion to allow discovery by a criminal defendant, including the examination of a body in some circumstances. However, it held that it would not judicially legislate by requiring a coroner to retain possession of a body until a defendant requests permission to conduct his own autopsy examination, finding, due process does not compel such a ruling.

La. C.Cr.P. art. 718 allows a defendant, upon motion, to scientifically test tangible objects within the possession, custody, or control of the state which: "(1) are favorable to the defendant and which are material and relevant to the issue of guilt or punishment, or (2) are intended for use by the state as evidence at the trial, or (3) were obtained from or belong to the defendant."